**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 17-cv-5826 |
| v. | ) ) | Hon. Steven C. Seeger |
| AMERIPRISE FINANCIAL SERVICES, INC., | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Allstate Insurance Company and Allstate Life Insurance Company employ independent contractors who sell insurance plans. Defendant Ameriprise Financial Services, Inc. hired some of those contractors away from Plaintiffs.

According to Plaintiffs, the new employees brought confidential information with them to Ameriprise. So, Plaintiffs sued Ameriprise, claiming that Ameriprise had misappropriated trade secrets in violation of the Defend Trade Secrets Act, tortiously interfered with Allstate's business, and engaged in unfair competition.

Discovery came and went. The parties then filed cross motions for summary judgement. For the following reasons, Plaintiffs' motion for partial summary judgment is denied, and Defendant's motion for summary judgment is granted in small part and denied in large part.

### Background

Before diving in, the Court offers one overarching observation. The parties take a scorched-earth approach to disputing one another's factual allegations. Flamethrowers could not have improved the level of scorching.

Few paragraphs survived the flame. For example, Ameriprise disputes 92 of Plaintiffs' 112 statements of fact. *See* Def.'s Resp. to Pls.' Statement of Facts (Dckt. No. 278). Plaintiffs return the favor, disputing 43 of Ameriprise's 46 statements of additional facts. *See* Pls.' Resp. to Def.'s Statement of Additional Facts (Dckt. No. 293).

And in terms of sheer breadth, the parties spend 230 pages *responding* to one another's statements of facts – not counting the pages in their various memoranda of law. *See* Def.'s Resp. to Pls.' Statement of Facts; Pls.' Resp. to Def.'s Statement of Facts (Dckt. No. 271); Def.'s Resp. to Pls.' Statement of Additional Facts (Dckt. No. 297); Pls.' Resp. to Def.'s Statement of Additional Facts. That's a lot of fire-bombing.

The level of contentiousness between the parties was unusually and unnecessarily high. The incendiary approach to summary judgment made this Court's review of the record especially difficult, and slowed things down.

## I.     The Parties

This case involves four relevant businesses: (1) Allstate Insurance Company; (2) Allstate Life Insurance Company; (3) Allstate Financial Services, LLC; and (4) Ameriprise Financial Services, Inc. Before diving into the facts, it's helpful to understand who these four entities are and what each of them do.

Plaintiff Allstate Insurance Company ("AIC") provides automobile insurance, property and casualty insurance, and life insurance to individuals and businesses. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 5 (Dckt. No. 278). One way that AIC provides these products and services to consumers is through the appointment of an independent "Exclusive Agent." *Id.* AIC currently employs around 11,000 Exclusive Agents. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 3 (Dckt. No. 271).

Plaintiff Allstate Life Insurance Company ("ALIC") is a life insurance company that provides life insurance and other fixed products, like fixed annuities. *Id.* at ¶ 4. AIC owns ALIC. *Id.*

Like AIC's model, ALIC sells its products and services through independent contractors – which it calls "Exclusive Financial Specialists." *Id.*; Pls.' Resp. to Def.'s Statement of Facts, at ¶ 4 (Dckt. No. 271). For clarity, the Court will frequently refer to these Exclusive Financial Specialists simply as "financial advisors."

The parties do not agree about the relationship between AIC and ALIC. According to Plaintiffs, AIC and ALIC work together – through their Exclusive Agents and Exclusive Financial Specialists – to "cross-sell" Allstate products and services. *See* Pls.' Statement of Facts, at ¶ 7 (Dckt. No. 239).

More specifically, the ALIC Exclusive Financial Specialists can sell "life and financial products" to AIC's customer base, granting those financial advisors "immediate access to 16 million customers and 13 million households." *Id.* at ¶¶ 7–8. This large customer pool ensures that the ALIC Exclusive Financial Specialists "never run[] out of people to call for the sale of ALIC products," and ALIC does not require the advisors to generate business outside of AIC's existing customer base. *Id.* at ¶¶ 9–10.

Ameriprise disagrees, but it doesn't point to any evidence that casts doubt on Plaintiffs' main point: AIC Exclusive Agents work with ALIC Exclusive Financial Specialists to sell life insurance and financial products to AIC's customers – and that's a large pool of customers. *Compare* Def.'s Resp. to Pls.' Statement of Facts, at ¶¶ 7–11 (Dckt. No. 278), *with* Maciejewski Dep., at 27:16-21 (Dckt. No. 239-4) ("So the value proposition that we have is, we have an endless supply of potential candidates or customers, because you're [(an Exclusive Financial

3

Specialist)] partnering with an agency that has thousands of households that may need financial products."); Dougherty Dep., at 34:6-8 (Dckt. No. 239-2) ("We don't have a customer acquisition challenge. We have a customer activation challenge."); *id.* at 70:8-17 ("And then we have an [Exclusive Agent and Exclusive Financial Specialist] partnership agreement where they memorialize that agreement in our database, and they agree to things like . . . . Is the [Exclusive Financial Specialist] going to have full access to the agent's eAgent and access Allstate books of business, or will they have restricted access?"); *id.* at 72:1-5 ("[T]he general flow is from the [Exclusive Agent] to the [Exclusive Special Agents], which makes sense because the point of first contact with the American consumer is the Allstate agent, and we bring in about a million new customers a year."). Without any evidence refuting this proposition, the Court deems it admitted.

That said, an Exclusive Special Agent cannot sell certain financial products as an independent contractor of ALIC (with or without an AIC Exclusive Agent's partnership). To explain those products, the Court must introduce a relevant non-party in this case: Allstate Financial Services, LLC ("AFS").

AFS is a subsidiary of AIC, but not ALIC. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 6 (Dckt. No. 278); Def.'s Resp. to Pls.' Statement of Additional Facts, at ¶ 2 (Dckt. No. 297). AFS is registered with the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 18 (Dckt. No. 271). It sells securities, including variable annuities and mutual funds. *Id.* FINRA-licensed Exclusive Financial Specialists can sell those securities through AFS. *Id.*

Note the different products offered by ALIC and AFS. ALIC is not a broker-dealer or registered with FINRA, so it cannot sell securities (*e.g.*, variable annuities or other equity-based

insurance products). *See* Albanese Dep., at 37:16-18, 38:5-11 (Dckt. No. 247-11); *see also* Guntli Dep., at 61:12-17 (Dckt. No. 247-12). In contrast, AFS is registered with FINRA and can sell securities, like variable annuities. *See* Albanese Dep., at 37:12-15.

So, as explained in more detail below, an Exclusive Financial Specialist ("EFS") can sell a fixed annuity for ALIC, while also selling variable annuities for AFS. *See* Klink Dep., at 67:3-11 (Dckt. No. 247-1); *see also id.* at 71:15-18. In those circumstances, the advisor would have two separate contractual agreements – one with ALIC to sell fixed annuities, and one with AFS to sell variable annuities. *Id.* at 67:12-22; *see also id.* at 144:5-22.[1] But an EFS *cannot* sell securities (like variable annuities) on behalf of ALIC – the advisor *must* sell the securities on behalf of AFS. *See, e.g.*, Klink Dep., at 71:15-18 (Dckt. No. 247-1) ("Q: An [Exclusive Financial Specialists] at ALIC cannot sell a variable annuity unless they have a contract with AFS and a FINRA license and sell through AFS, correct? A: That would be correct.").

Finally, Defendant Ameriprise is a wealth-management firm that offers its clients financial planning and advice, wealth management, and brokerage services through a network of about 10,000 financial advisors. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 1 (Dckt. No. 271). The company is registered as an investment adviser with the SEC and as a broker-dealer with FINRA. *Id.* at ¶ 2.

Plaintiffs say that Ameriprise "is a competitor of ALIC," while Ameriprise disputes that description. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 2 (Dckt. No. 278). Either way: the main point isn't hard to figure out: the two companies don't seem to get along (at least in this litigation).

---

[1] Plaintiffs argue that ALIC "provides . . . some financial products on behalf of Allstate subsidiaries, including [AFS]." *See* Pls.' Statement of Facts, at ¶ 6 (Dckt. No. 239). But, as explained above, this allegation is false to the extent it suggests that Exclusive Financial Specialists can sell securities on behalf of ALIC for AFS.

II.     **Exclusive Financial Specialists' Contracts with ALIC**

The Exclusive Financial Specialists (again, "financial advisors") are this suit's protagonists. The whole case revolves around them. Specifically, the parties care about Ameriprise's hiring of former Allstate financial advisors, and the contractual agreements that these advisors had with Plaintiffs and then with Ameriprise. So, the Court begins there, by diving into the contracts between the advisors and ALIC.

ALIC generally requires that Exclusive Financial Specialists have at least two years of experience in the financial-services industry before joining the company. *See* Pls.' Resp. to Def.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 293). ALIC recruits these Exclusive Financial Specialists from competitors in the insurance field. *Id.* at ¶ 1.

Upon joining ALIC, Exclusive Financial Specialists sign an agreement with the company called the "Allstate L2000S Exclusive Financial Specialist Independent Contractor Agreement." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 7 (Dckt. No. 271). The parties refer to this agreement as "the EFS Agreement," and the Court will too.

The EFS Agreement incorporates three relevant documents. *Id.* at ¶ 8.

The first is the Supplement for the L2000 Agreement, or "EFS Supplement." *Id.* The second is the Exclusive Financial Specialist Agency Standards, or "EFS Agency Standards." *Id.* The third is the Exclusive Financial Specialist Independent Contractor Manual, or "EFS Manual." *Id.*

These EFS Agreements apply just to the Exclusive Financial Specialists and ALIC, plus ALIC's affiliates and subsidiaries named in the EFS Supplement. *Id.* at ¶ 9. ALIC has two subsidiaries named in the EFS Supplement: (1) Lincoln Benefit Life Co., and (2) American Heritage Life Insurance Co. *Id.* So, the EFS Agreements are between the Exclusive Financial

Specialists on one hand and ALIC, Lincoln Benefit Life Co., and American Heritage Life Insurance Co. on the other. *Id.*

Additionally, the EFS Agreements required the Exclusive Financial Specialists to enter a separate contract with AFS. *Id.* at ¶ 16. This contract governed the individuals' work selling registered securities. *Id.* Of note here: Plaintiffs are *not* suing AFS for any of the Exclusive Financial Specialists' work selling registered securities – the contract simply allowed the Specialists to sell financial products that ALIC could not, like variable annuities. *Id.* at ¶ 19.

In the EFS Agreements, Exclusive Financial Specialists agree that they will not disclose any "confidential information" or any information containing "trade secrets" about ALIC's matters without ALIC's approval. *Id.* at ¶ 10. The EFS Agreements define the term "confidential information" at length:

> Confidential information includes, but is not limited to: business plans of the Company, information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by you only for the purposes of carrying out this Agreement.

*Id.* at ¶ 11 (quoting EFS Supplement IV(D)) (Dckt. No. 344-2, at 68 of 234). In contrast, the EFS Agreements do not define "trade secrets" (presumably because the term is a legal term of art). *Id.* at ¶ 12.

The EFS Agreements maintain the prohibition on disclosures of confidential information and trade secrets perpetually, even after termination of the EFS Agreement. *Id.* at ¶ 10.

The agreement also prohibits former Exclusive Financial Specialists from soliciting, selling, or serving life insurance policies, annuity contracts, or other business in competition with ALIC for one year after termination. *Id.* at ¶ 13. More specifically, the Exclusive Financial Specialists agreed not to solicit, sell, or serve products to anyone to whom they sold to while working for ALIC or to anyone who they discovered from working at ALIC. *Id.*

The agreement's non-solicitation provision came with two exceptions.

The first exception was about customer choice. The EFS Manual allowed Exclusive Financial Specialists to transfer out mutual funds and variable annuities with customer consent and when requested by a customer, if the EFS ended its relationship with ALIC for any reason besides a securities law violation. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 15 (Dckt. No. 271).

The second exception was about pre-existing clients. The EFS Manual reserved the right for Exclusive Financial Specialists to transfer and service any clients obtained before they became affiliated with AFS. *Id.* at ¶ 14. Put differently, old clients were grandfathered in.

Finally, either an EFS or ALIC could terminate the EFS Agreement with or without cause. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 17 (Dckt. No. 278). The terminating party simply needed to provide "90 days written notice, or such greater number of days as required by law." *Id.*

Allstate required EFSs to participate in annual compliance training and other courses covering the topic of confidential information. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 26 (Dckt. No. 278).

There's a lot of moving parts, and the parties fight tooth and nail on almost every fact going forward. It's the legal equivalent of trench warfare. The record is voluminous, with interminable factual disputes around every corner.

So, to help cut through the quagmire, the Court offers the following high-level summation: Plaintiff AIC owns Plaintiff ALIC. ALIC is a life insurance company that sells life insurance and other fixed products, like fixed annuities. ALIC employed the financial advisors (EFSs) central to this case. Financial advisors sold fixed annuities on behalf of ALIC, and sometimes variable annuities on behalf of another company, AFS (also owned by AIC). And as a condition of their employment with ALIC, financial advisors signed the EFS Agreement, which subjected them to certain confidentiality and non-solicitation obligations both during and after their employment.

With that general background in hand, the Court sets out the remaining facts.

## III. Ameriprise's Recruitment Procedure

Ameriprise asks prospective financial advisors who it recruits to provide any contract agreements that the advisors have with their current firms. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 20 (Dckt. No. 271).[2] So, many of the former Exclusive Financial Specialists who left ALIC for Ameriprise submitted their EFS Agreements to Ameriprise. *Id.* at ¶ 21.

Ameriprise also generally asks prospective advisors to provide commission statements or similar records from their current firms. *Id.* at ¶ 24. Ameriprise uses those records to verify the advisors' self-reported financial performance. *Id.*

---

[2] Plaintiffs responded here, and elsewhere, by admitting that fact and then "[f]urther answering" with additional facts. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 19–21, 29, 31–32, 46–48, 69, 79, 89, 108 (Dckt. No. 271); *see also* Pls.' Resp. to Def.'s Statement of Additional Facts, at ¶¶ 3, 7–9, 33, 42 (Dckt. No. 293). But Plaintiffs' response to Defendant's statement of facts is not the appropriate place for Plaintiffs to introduce more facts. *See* L.R. 56.1(e)(2) ("A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made."). If

But key to the dispute at hand, Plaintiffs and Ameriprise contest what client information falls into Ameriprise's hands during this recruitment process. Plaintiffs argue that Ameriprise recruits former Exclusive Financial Specialists, and then has them bring their client information over to the new company. Ameriprise disagrees.

The parties dispute three sets of facts: (1) Ameriprise's due diligence procedures for incoming Exclusive Financial Specialists; (2) Ameriprise's "portability analysis" of potential advisors; and (3) Ameriprise's Non-Protocol Transition Guide for incoming advisors. For all three procedures, Plaintiffs argue that former ALIC Exclusive Financial Specialists transferred confidential client information from ALIC to Ameriprise.

First, as a matter of general due diligence, Ameriprise says that it "expressly and clearly" directs prospective advisors that they must prevent client-identifying information from being submitted to Ameriprise. *See* Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 241). Still, Ameriprise acknowledges that prospective financial advisors may submit statements that erroneously include client names or other information. *Id.* at ¶ 26.

But, in response to erroneously included client information, Ameriprise contends that it has a "standing policy across the organization that if any client-identifying information is received, that information is immediately deleted from [its] systems, and all parties are instructed to do so if they have any of that information on their computers." *Id.* at ¶ 27 (quoting George Dep., at 241:11 – 242:3 (Dckt. No. 247-13)). And Ameriprise contends that it stores any information submitted by a prospective advisor in the advisor's recruiting file on a network drive

_____

Plaintiffs wanted the Court to consider the facts in their "[f]urther answering" statements, then Plaintiffs should have included those facts in their statement of additional facts. *See* L.R. 56.1(b)(3); *see also* Pl.'s Statement of Additional Facts (Dckt. No. 278). Because Plaintiffs disregarded the Local Rules, the Court disregarded any facts introduced in that manner.

– which is not distributed outside Ameriprise's recruiting or transition teams. *Id.* at ¶ 28 (citing Vinson Dep., at 38:14-18, 202:23 – 203:22 (Dckt. No. 247-18)).

Plaintiffs view Ameriprise's due diligence process differently. They argue that Ameriprise does not expressly communicate with prospective advisors about providing client information. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 271). In fact, Ameriprise directs ALIC's Exclusive Financial Specialists to collect and *provide* specific client information, including weekly and monthly sales statements, a global client list, and commission statements. *Id.* at ¶¶ 25, 27. Ameriprise even suggests that incoming advisors bring their computers with them so that Ameriprise can search Plaintiffs' secure system for the client reports. *Id.* at ¶¶ 25, 27.

And after receiving client-identifying information, Ameriprise doesn't always say that the information (*e.g.*, reports with client names) was erroneously sent. *Id.* at ¶¶ 25–26. Instead, Ameriprise will forward the information within the company. *Id.* Plaintiffs also contend that the prospective advisors' information doesn't only stay on that advisor's recruiting file on a network drive – the information may also go to Ameriprise's General Counsel's office, outside counsel, and a SalesForce database. *Id.* at ¶ 28 (citing Vinson Dep., at 202:3-14 (Dckt. No. 247-18)).

Second, and in addition to its general due diligence, Ameriprise vets potential advisors through its "portability analysis." *Id.* at ¶ 30. This analysis determines an advisor's potential success at Ameriprise, focusing on whether – and to what extent – the advisor's financial products and other business can be transferred to Ameriprise. *See* Def.'s Statement of Facts, at ¶¶ 30–31 (Dckt. No. 241); Pls.' Resp. to Def.'s Statement of Facts, at ¶ 31 (Dckt. No. 271).

Plaintiffs agree that Ameriprise engages in a portability analysis, but they argue that the analysis occurs regardless of the Exclusive Financial Specialists' contractual obligations under

11

the EFS agreement. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 30.[3] And Ameriprise will even go out of its way to recruit ALIC Exclusive Financial Specialists who have particularly large books of life insurance business (*i.e.*, more clients). *Id.* at ¶ 33.

Third, Ameriprise says that it has an additional failsafe to ensure that advisors' client information doesn't transfer during the recruitment process: the Ameriprise Non-Protocol Transition Guide. *See* Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 241); *see also* Non-Protocol Transition Guide (Dckt. No. 244-3, at 194–255 of 261). That guide sets out the general process for bringing aboard new financial advisors from firms that aren't members of the Protocol on Broker Recruiting – such as ALIC. *See* Def.'s Statement of Facts, at ¶ 35.

According to Ameriprise, the company instructs advisors coming from firms like ALIC to avoid bringing any information from their prior firms. *Id.* at ¶ 34. And the Non-Protocol Transition Guide expressly tells incoming advisors that they cannot take account numbers, account statements, individual client files, contact databases, email addresses, and other client-based information. *See* Non-Protocol Transition Guide, at 9 (Dckt. No. 244-3, at 202 of 261).

That said, the guide allows one exception to the general ban on bringing information from a prior firm – the holiday list. In the Non-Protocol Transition Guide, Ameriprise directs new advisors to assemble "holiday lists" of "[a]cquaintances, friends, [and] family" based on memory and publicly available sources of information. *See* Def.'s Statement of Facts, at ¶¶ 36–37 (Dckt. No. 241). In other words, a list of "[a]nyone that the advisor would normally send a

---

[3] Plaintiffs also challenge Ameriprise's description of the process, but not really. According to Plaintiffs, the portability assessment seeks a detailed listing of the advisor's various financial products to "help all vested parties be prepared for a successful transition of [the advisor's] book of business," and Ameriprise uses this information to "expedite the transfer of [the advisor's] clients' assets to Ameriprise." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 30 (Dckt. No. 271) (citations omitted). That's not a serious factual challenge. Plaintiffs simply describe, in more words, the portability assessment's function: the smooth transfer of financial products.

holiday card to." *Id.* at ¶ 37. (Hence the "holiday" in holiday list.) But Ameriprise instructs new advisors to use this list only to announce that they have joined Ameriprise. *Id.* at ¶ 38.

Plaintiffs, once again, paint a different picture. They allege that although Ameriprise provides the Non-Protocol Transition Guide to incoming financial advisors, it fails to enforce or monitor compliance with its policies. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 271). Plaintiffs say the Guide is lip service. They focus on the holiday list.

Plaintiffs contend that, given the timing of the holiday list, Ameriprise must know that its incoming Exclusive Financial Specialists compile their lists while still affiliated with ALIC. *Id.* at ¶ 36. And those lists can include thousands of names. *Id.* at ¶ 37. Some incoming advisors label the names as "client households" and "client lists." *Id.* So, the lists can provide valuable client information to Ameriprise when used for purposes other than announcing a job change. *Id.* at ¶ 38.

## IV.     The Exclusive Financial Specialists at Issue

The parties dispute how many Exclusive Financial Specialists, meaning the people who left ALIC to join Ameriprise, are at issue. Ameriprise says that the case focuses on 13 EFSs who joined Ameriprise at various times between 2013 and 2017. *See* Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 241). Plaintiffs argue that the number of EFSs "at issue" is above 50, and that the relevant period spans from 2013 through 2019. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 271).

That said, the parties agree that one advisor, Stephen Caruso, plays a role in the story. Caruso worked as an EFS for Allstate Life Insurance of New York, a non-party subsidiary of ALIC. *Id.* at ¶¶ 17, 56. Caruso transferred to Ameriprise in 2012. *Id.* at ¶ 56. More on him later.

13

So, in sum, the parties primarily focus on 13 former ALIC EFSs who transferred to Ameriprise between 2013 and 2019, along with one former EFS (Caruso) who worked for nonparty Allstate Life Insurance Company of New York before transferring to Ameriprise in 2012.

## V.     Clients in Common

Notwithstanding their dispute on the number of advisors at issue, the parties agreed to a list of 211 "clients in common." *Id.* at ¶ 50. These 211 individuals were customers of the 14 former Exclusive Financial Specialists (including Caruso) at the time the advisors terminated their relationships with ALIC (or its subsidiary) and transferred to Ameriprise. *Id.* The customers then purchased insurance or a financial product at Ameriprise with the same EFS during that advisor's first year with Ameriprise. *Id.*

In keeping with the tenor of this litigation, the parties spill a barrel of ink on the distribution of these "clients in common" among the 14 former EFSs. For example, Ameriprise dedicates 91 of the 144 paragraphs in its statement of facts to describing the distribution of these clients, including the date of clients' policies with a specific advisor and when the polices were terminated (if at all). *See* Def.'s Statement of Facts, at ¶¶ 53–114 (Dckt. No. 241); *see also id.* at ¶¶ 89–91 ("Of the clients to whom Stillwell was assigned on his last day with ALIC, 26 (including Stillwell himself) were identified as Clients in Common. Of those 26, 16 had AFS accounts or products in addition to ALIC products. Also of those 26: two had an ALIC policy terminate during his first year with Ameriprise and one had an ALIC policy terminate at some point after Stillwell's first year with Ameriprise . . . .").

14

Plaintiffs, for their part, devote 38 pages to dispute these facts (more than half of their 72-page response). *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 53–114 (Dckt. No. 271). But on closer inspection, Plaintiffs' response doesn't add much substance.

Plaintiffs primarily argue that the "clients in common" list doesn't tell the full story. They say that the 211 shared clients don't represent the only customers or damages at issue in this litigation. *Id.* at ¶ 32. Along with the agreed "clients in common" list, "Plaintiffs also produced an 'agree to disagree' list of customers 'in common' but because of certain discrepancies in how names were entered in the database (i.e., John H. Doe vs. John Doe), Ameriprise would not agree that the same customer was being serviced at Ameriprise if the names were not an exact match." *Id.* at ¶ 32. The "agree to disagree" list also includes customers who transferred to Ameriprise, but who only had an AFS product – not an ALIC product – at the time the EFS left Allstate. *Id.* at ¶ 50.

Plaintiffs then refer to the "agree to disagree" list 89 times throughout their response, frequently relying on the exact same language above (including the same paragraph) to dispute a fact. *See, e.g.*, ¶¶ 50, 51, 54, 57, 58, 59, 60, 62, 63, 64, 65, 67, 68, 71, 72, 73, 74, 75, 77, 78, 80, 81, 82, 84, 85, 86, 87, 89, 90, 91, 92, 93, 96, 97, 98, 99, 101, 102, 103, 104, 108, 109, 110, 111, 112.

But despite referencing an "agree to disagree" list close to 100 times, Plaintiffs never once cite to the record. Plaintiffs don't give the Court any reason to believe that this purported "agree to disagree" list broadens this litigation – let alone that this list even exists.

At summary judgment, a flat denial isn't enough. A party disputing a fact must "cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3). Plaintiffs did not support their

15

denials of the clients in common list with any evidence, so Ameriprise's facts on the distribution of those clients are deemed admitted. Relatedly, the Court will consider only the 211 "clients in common" when ruling on the present motions.

## VI.    Alleged Trade Secrets

The alleged trade secrets in this case consist primarily of AIC and ALIC-collected information relating to customers and the policies they hold. Plaintiffs refer to this information collectively as their "customer lists." *See* Pls.' Mem. in Support of Summ. J., at 7 (Dckt. No. 238).

"Customer lists," Plaintiffs allege, are client data profiles put together by ALIC through its relationship with the client vis-à-vis an EFS. That data includes client name, age, contact information, and information about policies the client holds – such as the policy types, amounts of insurance, premium amounts, renewal dates, and so on. *Id.* at 7–8. Plaintiffs allege that this compilation of data, rather than the data individually, warrants trade secret protection. *Id.* at 8 ("[I]t is the compilation of this information in Allstate proprietary and protected databases that makes the information as a whole valuable to a competitor like Ameriprise and worthy of trade secret protection.").

In addition to their client-related information, Plaintiffs also identify certain "financial and business information" as trade secrets. *See* Pls.' Mem. in Support of Summ. J., at 8 (Dckt. No. 238). This information includes sales statements, commission statements, and the EFS Supplement. *Id.*; *see also* Pls.' Resp. to Def.'s Mtn., at 4 (Dckt. No. 270).

## VII.    The Lawsuit

In August 2017, Plaintiffs sued Ameriprise. *See* Cplt. (Dckt. No. 1). They brought three claims: (1) a violation of the Defend Trade Secrets Act; (2) tortious interference with business

16

relationships; and (3) unfair competition. *Id.* at Counts I–III. Discovery came and went, and both parties now move for summary judgment. *See* Pls.' Mtn. for Partial Summ. J. (Dckt. No. 237); Def.'s Mtn. for Summ. J. (Dckt. No. 240).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

When, as here, parties file cross motions for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the party against whom the motion was

filed. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017). The Court treats the motions "separately in determining whether judgment should be entered in accordance with Rule 56." *Marcantante v. City of Chicago*, 657 F.3d 433, 439 (7th Cir. 2011); *see also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416 (7th Cir. 2019) ("Each cross movant for summary judgment bears a respective burden to show no issue of material fact with respect to the claim.").

## Analysis

Both Plaintiffs and Defendant moved for summary judgment on all three counts. *See* Pls.' Mem. in Support of Partial Summ. J., at 5–29 (Dckt. No. 238); Def.'s Mem. in Support of Summ. J., at 10–29 (Dckt. No. 242). Plaintiffs request summary judgment on the question of liability for each claim, putting off damages for trial. *See* Pls.' Mem. in Support of Partial Summ. J., at 4. Defendant seeks to end the case here and now, requesting summary judgment on all three claims in their entirety.

## I. Standing Issues

Ameriprise raises several preliminary issues that the Court must address before turning to the merits.

First, Ameriprise asks this Court to dismiss Plaintiff Allstate Insurance Company from the case. As Ameriprise sees it, "AIC does not have standing to sue Ameriprise, as AIC's sole connection with this case is that it owns ALIC." *See* Def.'s Mem. in Support of Summ. J., at 27 (Dckt. No. 242). With no hook besides owning ALIC, Ameriprise thinks that AIC has nothing to hang its hat on.

Ameriprise underplays AIC's stake in this case. AIC isn't simply acting as a helicopter parent in its subsidiary's trade secrets litigation. Rather, the evidence shows that AIC's own trade secrets are on the line. It has skin in the game.

ALIC and AIC store their client information jointly. That is, client information for both AIC *and* ALIC is housed in a shared Allstate database. *See* Schmidt Dep., at 245:9 – 246:19 (Dckt. No. 239-5). The client information contained in that database is the subject of this case.

AIC therefore has standing to sue. "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate commerce." *See* 18 U.S.C. § 1836(b)(1).

Thus, the fact that AIC is not a party to the EFS Agreements is beside the point. AIC owns trade secrets at issue, so it is a proper party to this litigation. *See R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194 (W.D.N.Y. 2020) (finding that parent company had standing to bring DTSA claims for misappropriation for trade secrets against its subsidiary's former employees and competitor where the complaint contained specific allegations of misappropriation of the parent company's trade secrets).

Second, Ameriprise argues that the Court should dismiss any claims related to Stephen Caruso for lack of standing. The Court agrees.

Caruso, as the Court has already noted, was employed by non-party ALIC New York, a subsidiary of plaintiff ALIC. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶¶ 17, 56 (Dckt. No. 271). Caruso's employment agreement was between him and ALIC *New York*, not ALIC. So, ALIC did not employ Caruso.

Plaintiffs point to the terms of Caruso's employment agreement and argue that Caruso was an employee of ALIC, not ALIC New York. *See* Pls.' Resp. to Def.'s Mtn., at 26 (Dckt. No.

270). But the agreement says no such thing. Caruso's employment agreement stated that it was between "Allstate Life Insurance Company of New York and such affiliates and subsidiaries . . . as are named in the *Financial Specialist Procedure Manual*." *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 14 (Dckt. No. 278). The manual doesn't list ALIC or AIC as falling into those categories.

So, Caruso was not an employee of ALIC, and his employment agreement did not create any contract between him and ALIC. The Court therefore dismisses any claims related to Stephen Caruso.

## II. Violation of the Defend Trade Secrets Act (Count I)

The Court now turns to the claims in this case. First, Plaintiffs contend that Ameriprise misappropriated their trade secrets in violation of the Defend Trade Secrets Act ("DTSA"). *See* Cplt., at ¶ 109–26 (Dckt. No. 1).

Under the Defend Trade Secrets Act, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836(b)(1). To succeed, a plaintiff must show (1) the existence of a trade secret, and (2) that the defendant misappropriated that trade secret. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1065–66 (N.D. Ill. 2020); *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 831 (N.D. Ill. 2019); *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 919–20 (N.D. Ill. 2016).

Plaintiffs brought their trade secrets claim under the federal DTSA. For its analysis, however, the Court also relies on cases interpreting claims under the Illinois Trade Secrets Act, "because the elements of a claim arising under those statutes are the same." *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 2019 WL 955354, at *72 n.13 (N.D. Ill. 2019). Courts have

20

regularly noted that the state statute and the DTSA "impose[ ] the same requirements," and that "the pertinent definitions of the two acts overlap." *Mickey's Linen v. Fischer*, 2017 WL 3970593, at \*9 (N.D. Ill. 2017); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at \*2 (N.D. Ill. 2017); *see also* 765 ILCS 1065 *et seq.*

The parties disagree about whether the evidence is sufficient on both of the two elements of a DTSA claim – *i.e.*, the existence of a trade secret and Ameriprise's misappropriation. So the Court addresses each element in turn.

## A.    Trade Secret Status

The first question is whether the case involves trade secrets.

The Defend Trade Secrets Act defines "trade secrets." The definition provides a nonexclusive list of trade secrets: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *See* 18 U.S.C. § 1839(3).

Then, the statute qualifies those "forms and types" of "information," through two requirements: (1) the owner must have "taken reasonable measures to keep such information secret," and (2) the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *See* 18 U.S.C. § 1839(3)(A)–(B).

21

"Both of the Act's statutory requirements focus fundamentally on the secrecy of the information sought to be protected." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003) (describing the substantive requirements under the Illinois Trade Secrets Act).

But the two requirements emphasize different aspects of secrecy. The first requirement – that the plaintiff take reasonable measures to maintain secrecy – "prevents a plaintiff who takes no affirmative measures to protect others from using its proprietary information from obtaining trade secret protection." *Id.* at 722. The second requirement – that the information be sufficiently secret to impart economic value – "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large." *Id.*

So, to show that particular information is a trade secret, a plaintiff must demonstrate that (1) the information is valuable, (2) it is "not known to others who might profit by its use," and (3) it "has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (explaining the elements necessary to prove trade secrets under Wisconsin Uniform Trade Secrets Act, which defines "trade secret" using the same elements – and sometimes the same language – as the DTSA).

"In many cases, the existence of a trade secret is not obvious, and requires an ad hoc evaluation of all the surrounding circumstances." *Learning Curve Toys*, 342 F.3d at 723. As a result, the Seventh Circuit has warned district courts that "[t]he existence of a trade secret [under the ITSA] ordinarily is a question of fact . . . best 'resolved by a fact finder after full presentation of evidence from each side.'" *Id.* (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). Such is the case here.

### 1.     Identifying the Trade Secrets

As an initial matter, Ameriprise argues that Plaintiffs have not identified the trade secrets at issue in this case with enough specificity.  *See* Def.'s Mem. in Support of Summ. J., at 10 (Dckt. No. 242).

A plaintiff must identify the purported trade secret with an appropriate level of specificity.  *See IDX Sys.*, 285 F.3d at 584.  "Such particularity is necessary given that a plaintiff cannot prevail at trial [under the DTSA] unless it identifies its trade secrets in sufficient detail that the trier of fact can determine what information comprises the secret and whether it was kept a secret."  *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1130 (N.D. Ill. 2019).

So, before a court or jury can determine whether certain information constitutes a trade secret, the plaintiff must adequately point to what its trade secret *is*.  "[W]here a plaintiff suggests that general categories of information are trade secrets, the lack of specificity greatly reduces its chances of demonstrating that a defendant has misappropriated its trade secrets."  *Id.*

"Hence, [a plaintiff] cannot state a claim for trade secret protection . . . simply by producing long lists of general areas of information which contain unidentified trade secrets."  *GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235, at *5 (N.D. Ill. 2015) (alterations in original) (quoting *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 672 (N.D. Ill. 1997)).  "A plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."  *IDX Sys., 285 F.3d at 584*; *see also AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987).  "The plaintiff must show concrete secrets."  *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992).

Plaintiffs at first struggle to pin down the trade secrets in this case. Many of their briefs adopt an approach that could be dubbed: "If Ameriprise asked for it, it was a trade secret."

For example, Plaintiffs' opening memorandum focuses almost exclusively on what Ameriprise requested from incoming financial advisors – not what information is a trade secret. *See, e.g.*, Pls.' Mem. in Support of Summ. J., at 6 (Dckt. No. 238) ("Ameriprise . . . instructed the transitioned EFSs to send Ameriprise (prior to their transition) a list of ALIC and AIC clients, including names, addresses, phone numbers, and other contact information."); *id.* at 7 ("In addition to the client lists, during recruitment Ameriprise also requires the EFSs to provide 'firm generated [official] documentation' showing, among other things, the breakdown of business the EFS serviced at Allstate . . ."); *id.* at 8 ("Often times Ameriprise directed the EFS to exactly which statements within the Allstate system to collect and provide, including "weekly and monthly sales statements," a "Global Client List," and commission statements.").

That approach won't do. "[T]o sustain a trade secrets claim a party must do more than simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret.'" *Nilssen,* 963 F. Supp. at 672 (internal quotations omitted). The task of identifying trade secrets isn't about what the defendant did; it's about what the plaintiff wants to protect. And on that front, a plaintiff can't just gesture vaguely to amorphous material.

Eventually, however, Plaintiffs zoom in on a few items. They articulate their trade secrets as: (1) client contact lists; (2) global client lists; (3) historical client product; (4) client policy and payment information; (5) the EFS Supplement, which contains compensation and commission program details; and (6) historical business information particular to the individual EFSs, including monthly compensation plans and commission statements. *See* Pls.' Resp. to Def.'s Mtn., at 3–4 (Dckt. No. 270).

24

That's a lot. So, to help clarify its analysis, the Court interprets Plaintiffs' trade secrets as falling into two categories: (1) client-related information; and (2) proprietary business information. The Court addresses each category in turn.

Beginning with the first category – Plaintiffs' client information – Ameriprise argues that Plaintiffs have not carried their burden of pinning down the specific customer information that they seek to protect. *See* Def.'s Mem. in Support of Summ. J., at 10–11 (Dckt. No. 242). "[T]hey have not identified a specific compilation, contact file, or document at issue here." *Id.* at 12.

The Court finds that Plaintiffs have met their burden and sufficiently identified their trade secrets relating to their customer information. The customer information consists of Allstate-collected information about customers and the policies they hold. Plaintiffs refer to this information collectively as their "customer lists." *See* Pls.' Resp. to Def.'s Mtn., at 7 (Dckt. No. 270).

Plaintiffs' "customer lists" are client data profiles that Allstate put together through its relationship with the client vis-à-vis an EFS. That data includes client name, age, contact information, and information about policies the client holds – such as the policy types, amounts of insurance, premium amounts, renewal dates, and so on. *Id.* at 7–8.

Plaintiffs allege that this compilation of data, rather than the data individually, warrants trade secret protection. *Id.* at 8 ("[I]t is the compilation of this information in Allstate proprietary and protected databases that makes the information as a whole valuable to a competitor like Ameriprise and worthy of trade secret protection.").

Plaintiffs specifically identify the information that falls within the ambit of the compilations of customer data they seek to protect. That information includes "lists of customers

and customer contact information from the EFS's Allstate books of business," "historical client product information, policy and payment information, dates of birth, and other critical information that, as compiled, paints a picture for a competitor as to how to service that customer, including areas of vulnerability for the sale or marketing of new products." *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 9 (Dckt. No. 292); *see also* Pl.'s Mem. in Support of Summ. J., at 7 (Dckt. No. 238) (quoting the EFS Agreement and describing Allstate confidential information as including "names, addresses, and ages of policyholders," and the "types of policies, amounts of insurance, premium amounts, the renewal dates of policies, policyholders' listings and any policy holder's information subject to any privacy law").

Customer lists, meaning a business's collection of customer identities, are protectable trade secrets. *See Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016) ("Trade secrets include 'customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information.'") (quoting *Mintel Intern. Grp., Ltd. V. Neergheen*, 2010 WL 145786, at *11 (N.D. Ill. 2010)); *Mickey's Linen*, 2017 WL 3970593, at *9 ("Although the DTSA does not expressly include customer lists within its definition of a trade secret, its definition includes any valuable business information for which reasonable measures are taken to maintain secrecy, and is therefore applicable to customer lists."); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (granting summary judgment on trade secrets claim, noting the "obvious and well recognized" value of customer and potential customer contact information); *see also* ILCS 1065/2(d) (including "list of actual or potential customers" within the definition of a trade secret).

Likewise, courts have regularly held that "customer-specific information," like the client contact and policy-related data at issue here, may warrant trade secret protection. *See, e.g.*,

*Vendavo*, 397 F. Supp. 3d at 1131; *Mickey's Linen*, 2017 WL 3970593, at *9 ("[C]ustomer-specific information warrants trade secret protection so long as it was maintained in confidence"); *APC Filtration*, 646 F. Supp. 2d at 1010 (concluding that "customer-specific information such as product preferences and deviated pricing" was protectable under the Illinois Trade Secrets Act); *Am. Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 933 (7th Cir. 2007) (finding customer information database a protectable trade secret where the plaintiff had filtered the clients for their suitability to buy insurance).

Plaintiffs have adequately identified their customer-related trade secrets. Plaintiffs' customer information is "sufficiently definite for the Court to determine what information comprises the secret and whether it was kept secret." *Vendavo*, 397 F. Supp. 3d at 1131 (internal quotation marks omitted).

As to the second bucket – Allstate's "proprietary business information" – the Court reaches a slightly different conclusion. Plaintiffs have identified some, but not all, of the information with the requisite degree of specificity.

Plaintiffs broadly define the second category of trade secrets as "proprietary business information." *See* Pls.' Resp. to Def.'s Mtn., at 4 (Dckt. No. 270). Apparently, that information includes "weekly and monthly sales statements," "commission statements," "financial documents," "manuals," and "other Allstate generated documents." *See* Pls.' Mem. in Support of Summ. J., at 8 (Dckt. No. 238); Pls.' Resp. to Def.'s Mtn., at 5 (Dckt. No. 270).

At summary judgment, a plaintiff's misappropriation claims are limited only "to trade secrets that are supported by the particular documents that [it] has specified in [its] memoranda." *Nilssen*, 963 F. Supp. at 673. And here, Plaintiffs have a hard time pinning down which

"proprietary business information" is at issue – and an even harder time pointing to record evidence of what those documents were.

The only business information that Plaintiffs specifically identify and support with record evidence are EFS commission and sales statements. Plaintiffs point to two documents, both apparently pulled from Allstate's internal systems. The first document is EFS "premium/deposits summary," which details ex-EFS Troy Trahan's production. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 62 (Dckt. No. 278). The other shows ex-EFS Al Kulig's "totals by product" report. *Id.* at ¶ 61.

Commission and sales reports are protectable as trade secrets. *See Network Cargo Sys. Int'l, Inc. v. Pappas*, 2014 WL 1674650, at *4 (N.D. Ill. 2014); *see also Mickey's Linen*, 2017 WL 3970593, at *10 (finding that "closely guarded financial information" such as profitability and financial data for each department "plainly qualifies for trade secret protection"). Plaintiffs may therefore proceed on claims related to EFS-specific commission and sales statements at trial.

But the Court finds that Plaintiffs have not identified the rest of the information at issue with the requisite degree of specificity (or sometimes any specificity whatsoever). The Court is left wondering what that information is, and whether it exists.

Consider Plaintiffs' claims relating to the EFS Supplement. Plaintiffs at times seek protection for the *entire* 100-page document. *See* Pls.' Resp. to Def.'s Mtn., at 3–4 (Dckt. No. 270) ("[T]he trade secrets at issue are . . . proprietary business information including [Plaintiffs'] EFS Supplement."). But at others, Plaintiffs suggest that only *certain* information in the EFS Supplement is at issue. *Id.* at 4 n.1 (stating Allstate's "position that its Supplement contains Allstate trade secrets").

28

When Plaintiffs attempt to pinpoint which information in the Supplement they seek to protect, they remain vague. According to Plaintiffs, the Supplement "contains, among other things, details regarding Allstate's compensation and commission program." *Id.* at 4. Even then, Plaintiffs fail to cite to the Supplement or specific portions of that lengthy document.

These vacillating statements leave the Court with two questions: Do Plaintiffs seek to protect the EFS Supplement in whole, or in part? And if the latter, which part?

Similar vagueness proved fatal in *GlobalTap LLC v. Elkay Mfg. Co.*, 2015 WL 94235 (N.D. Ill. 2015) (Pallmeyer, J.). There, the plaintiff identified information contained in its "Business Plan" as a trade secret. *Id.* at *5. The plan was a 101-page document consisting of the plaintiff's business concept, market opportunity, financial projections, and marketing and operating strategy. *Id.*

Judge Pallmeyer held that plaintiff had failed to identify which information in the sprawling document amounted to a trade secret. Plaintiff had "done nothing more than point to the entire 101-page document," even claiming that "every word" was a company trade secret. *Id.* at *6. Generality of this kind was insufficient, especially because the business plan contained information, such as statistics on "global water issues," that was plainly not a trade secret. *Id.* Judge Pallmeyer concluded that "[w]hile there may well be trade secrets within the 101-page Business Plan, it was Plaintiff's burden to identify those secrets and it has repeatedly failed to do so." *Id.*

So too here. The Court is left to grasp at straws. Plaintiffs' claim about the EFS Supplement "invite[s] the court to hunt through the details in search of items meeting the statutory definition" of a trade secret. *Id.* at *7 (quoting *IDX*, 285 F. 3d at 584). This Court declines that invitation at summary judgment.

29

The Court cannot analyze whether the EFS Supplement or any specific parts of it were trade secrets without first knowing whether Plaintiffs think the document is a trade secret in whole or in part. And to the extent that Plaintiffs think that certain portions of the 100-page Supplement are trade secrets, they never identify those parts.

As in *GlobalTap*, the EFS Supplement may contain trade secrets. Perhaps the Supplement as a whole is a trade secret. But it was Plaintiffs' burden to make that clear, and they haven't done so across several briefs and years of discovery. A plaintiff may not proceed on a misappropriation claim by "producing long lists of general areas of information which contain unidentified trade secrets." *See Nilssen,* 963 F. Supp. at 672. As a result, Plaintiffs may not pursue claims of misappropriation related to the EFS supplement.[4]

Plaintiffs also identify "other Allstate generated documents" as trade secrets in this case. *See* Pls.' Mem. in Support of Summ. J., at 8 (Dckt. No. 238). The documents allegedly include "client names, renewals, assets, and recent activity on those accounts." *Id.*

The reader may wonder, "which documents?" The Court has the same question. Plaintiffs do not support their gesture to "other documents" with references to any document in evidence (besides the commission statements the Court has already discussed). *Id.* at 8 (citing Pls.' Statement of Facts, at ¶ 62 (Dckt. No. 239)). An amorphous and unsupported trade secret is no trade secret at all. *See Nilssen,* 963 F. Supp. at 673–74. As a result, Plaintiffs may not proceed on claims relating to these documents.

---

[4] There are other reasons to conclude that the EFS Supplement is not a trade secret. Plaintiffs don't argue that the EFS Supplement as a whole derives any value from secrecy, which alone is enough to conclude that the Supplement is not a trade secret. Plaintiffs also do not take reasonable measures to protect the Supplement. As Plaintiffs' Rule 30(b)(6) witness testified, an EFS could disclose the Agreement to any third party without Allstate's permission from whom the EFS sought advice about his obligations under the Agreement. *See* Klink Dep., at 210:7-14 (Dckt. No. 247-1).

Finally, Plaintiffs declare that "Ameriprise stole and used additional Allstate trade secrets," but that they are "only relying on the trade secrets discussed in this brief for purposes of summary judgment." *See* Pls.' Mem. in Support of Summ. J., at 6 n.2 (Dckt. No. 238). Apparently, Plaintiffs have some more cards up their sleeve. They're just saving them for later.

That won't do. Summary judgment was the time to identify Plaintiffs' trade secrets. "By the summary judgment and trial stages plaintiff must describe its trade secrets in sufficient detail." *Von Holdt v. A-1 Tool Corp.*, 2005 WL 8180783, at *4 (N.D. Ill. 2005) (cleaned up). "[A] motion for summary judgment is the 'functional equivalent' of a trial in which it is asserted that material facts are not in dispute." *Nilssen*, 963 F. Supp. at 674.

Summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *See Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999). If Plaintiffs had cards to play, summary judgment was the time to lay them down. When it comes to identifying trade secrets, it's now or never.

Ameriprise's motion for summary judgment and its response to Plaintiffs' motion rest in part on its contention that Plaintiffs' claim should be rejected because of their lack of specificity in identifying their purported trade secrets. Plaintiffs "stood in no position to 'hold back' on any of the things that [they] contended met the legal requirement of such specificity." *Nilssen*, 963 F. Supp. at 674. After years of discovery, identifying all alleged trade secrets should have been simple.

In sum, Plaintiffs' package of alleged trade secrets is limited at trial to the compilations of customer-specific information and to proprietary Allstate business information showing EFS commissions and sales statements. Plaintiffs can't pursue claims related to the EFS Supplement,

or related to the other documents described above. And Plaintiffs may not seek liability for the misappropriation of any supposed trade secrets not identified in the motions now before the Court.

### 2.    Sufficient Secrecy to Derive Economic Value

Next, the Court turns to the question of secrecy. That is, now that the Court has pinned down what *might* constitute a trade secret, the Court must assess whether a jury could find that it is a trade secret.

Again, under the DTSA, the court has two requirements to consider: (1) whether the customer and business information is sufficiently secret to derive economic value from not being generally known; and (2) whether the customer and business information is subject to reasonable efforts to maintain its secrecy and confidentiality. *See* 18 U.S.C. § 1839(3); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) (quoting 18 U.S.C. § 1839(3)); *Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 216 (Ill. App. Ct. 1995) (describing the statutory requirements under the Illinois Trade Secrets Act).

Ameriprise argues that Plaintiffs' customer information wasn't secret at all. As Ameriprise sees it, finding customer information isn't difficult. So, Allstate's customer lists could easily be duplicated "by reference to telephone directories and Allstate's public website, which lists client testimonials with clients' first names and last initials." *Id.* at 13 (citing *Garon Foods, Inc. v. Montieth*, 2013 WL 3338292, at *4 (S.D. Ill. 2013)). All that a departing EFS (or a competitor) had to do was look them up.[5]

---

[5] Although Ameriprise does not explicitly make the argument, the Court notes for good measure that an employee's memorization of client customer data does not destroy its secrecy. "Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into non-confidential information." *SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at *6 (N.D. Ill. 2010) (quoting *Stampede*, 651 N.E.2d at 216–17.

32

To be sure, it is undisputed that at least some of the client information at issue is publicly available. Most people's names and phone numbers appear in the phone book. And in this case, at least some clients identified themselves by posting public reviews of their advisors on the Allstate website.

"Public knowledge" or information "generally known in an industry" cannot be a trade secret. *See Life Spine*, 8 F.4th at 540 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)). But Plaintiffs don't seek to protect a stray name in the phone book. Instead – and as this Court has already discussed – Plaintiffs' trade secrets lie in the compilation of customer names and customer-specific information. *See* Pls.' Resp. to Def.'s Mtn., at 4 (Dckt. No. 270).

The value of a compilation lies in its aggregation of information, regardless of whether some of that information is publicly available. "[E]ven if [the materials at issue] are just compilations of otherwise readily known facts, the compilations themselves are not available to competitors and presumably have some value by gathering the materials into one place." *SKF USA Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 714 (N.D. Ill. 2009); *see also 3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination affords a competitive advantage and is a protectable trade secret."); *see also Comput. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992); *Am. Family Mut. Ins. Co.*, 485 F.3d at 933; *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 897–98 (N.D. Ill. 2019) ("[A] compilation of data, even if the component parts are in the public domain, may be protectable as a trade secret if it would require substantial time, effort, and expense to recreate the compilation."). The law may not always protect individual Easter eggs, but it protects a basketful – especially from a competitor hoping to avoid the hunt.

33

Consider a precious family recipe. Perhaps a hungry competitor hoping to recreate the dish can taste the flour and the salt. And perhaps the family has disclosed that it also contains milk and eggs. But that doesn't destroy the recipe's trade secret status. The secret lies in how it all comes together – what to mix in, when, and how much. And if that information remains private, so too does the trade secret.

Ameriprise compares this case to *Garon Foods, Inc. v. Montieth*, 2013 WL 3338292, at *4 (S.D. Ill. 2013), but that case is readily distinguishable. *Garon Foods* involved alleged theft of plaintiff's list of cheese manufacturers and their contact information. *Id.* at *4. The court held that the list was not confidential because the cheesemakers were readily identifiable through a simple internet search. *Id.* There are only so many cheese manufacturers, and those cheese manufacturers make their presence known to the public.

Here, in contrast, Ameriprise points to no method by which a competitor could easily identify Allstate's customer base. There is no asterisk marking an Allstate customer in the phonebook. And although some Allstate client information appeared on testimonials on Allstate's website, that information had limited identification value because it only displayed a first name and last initial. *See* Exhibit 85, 86 (Dckt. No. 244-4, at 21–48 of 98).

Additionally, unlike the list of cheese manufacturers in *Garon Foods*, Allstate's client information goes beyond customer identities. Plaintiffs have put together much more than a list of names. They have compiled data profiles based on clients' product and policy choices – information that Ameriprise has not shown is publicly available.

Put another way, Plaintiffs do not claim that their customers' identities generally are trade secrets – they claim that their customers' identities *as customers* are trade secrets. It is one thing to track down any "John Smith." But it is another to know that John Smith is ready, willing, and

able to purchase life insurance.  Here, Plaintiffs' compilation of information – a universe of receptive customers – is sufficiently secret to warrant trade secret protection.  *See Am. Family Mut. Ins. Co.*, 485 F.3d at 933 (finding a customer database a protectable trade secret where "names in the plaintiff's database are filtered for their suitability to buy insurance, resulting, as the magistrate judge remarked, in 'a defined, manageable and economically viable universe of uniquely receptive potential customers'").

Ameriprise also argues that Plaintiffs fail to show that their client information derives its value from secrecy.  *See* Def.'s Reply to Pls.' Mtn. for Summ. J., at 14 (Dckt. No. 296); Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 14 (Dckt. No. 277).  Not so.

"The value of customer lists and pricing information . . . is obvious and well recognized." *APC Filtration*, 2008 WL 3008032, at *9 (collecting cases).  The sales industry is about customers.  And a universe of known customers  – who have purchased a product before or signaled willingness to purchase a product – puts a company at a competitive advantage.  Such a list "is compiled only gradually and with time."  *Id.*

Developed relationships are valuable.  So, where customer lists and historical sales information are not readily available to competitors, courts have held that "the effort spent to compile and maintain the data and the overall value which this information represented to the company is beyond dispute."  *APC Filtration*, 2008 WL 3008032, at *9.  "[C]ustomer lists developed by businesses that serve diffuse customers that have particular needs" are especially valuable because of the time and effort required to identify those customers.  *See First Fin. Bank, N.A. v. Bauknecht*, 71 F. Supp. 3d 819, 840 (C.D. Ill. 2014) (finding a list of banking customers – that took years to develop – sufficiently secret to derive economic value).

As discussed above, Plaintiffs' customer and business information was not readily ascertainable by Allstate's competitors in the insurance industry. It took years to develop – because it arose gradually over time through sales and relationship building. And while a competitor could find *some* customer information from public sources, Allstate's customer-specific information, such as policy purchase history and policy limit, could not be readily duplicated. That customer-specific data gave Plaintiffs a competitive advantage over their rivals.

Testimony in the record confirms the obvious. According to one Allstate employee, customer information is "the lifeblood of [the] company. . . . [E]verything we do really is – is enabled by the data, the information that we have collected and nurtured about those customers over the years." *See* Pls.' Statement of Facts, at ¶ 23 (Dckt. No. 239); *see also* Guntli Dep., at 84:20 – 85:4 (Dckt. No. 239-7). Customer data allows Allstate to identify "people who have raised their hand and suggested that they value getting financial advice, and are willing and able to purchase financial products and services." *See* Guntli Dep., at 86:1-8. Such data is a fast track to future sales, and future sales add value.

In short, Plaintiffs' trade secrets were sufficiently secret to derive economic value. So, Plaintiffs have met the first requirement of the Court's trade secret analysis for their customer-specific information and for business information showing EFS commissions and sales statements.

### 3.   Reasonable Efforts to Maintain Secrecy

Having considered the first requirement of its trade secret analysis, the Court turns to the second requirement: the efforts to maintain the secrecy of the trade secrets.

A plaintiff rarely loses on a misappropriation claim because of the "reasonable measures" element. "[T]he Seventh Circuit [has a] clearly stated preference for resolution by a fact-finder

36

of disputed trade secret issues, particularly the question of efforts to maintain secrecy." *See Motorola v. Lemko Corp.*, 2012 WL 74319, at *18–20 (N.D. Ill. 2012). It is "only in an extreme case [that] what is a reasonable precaution [can] be determined as a matter of law, because the answer depends on a balancing of costs and benefits that will vary from case to case." *Learning Curve Toys*, 342 F.3d at 723 (internal quotation marks omitted).

Here, the Court concludes that a genuine dispute of material fact exists about whether Plaintiffs made reasonable efforts to maintain the secrecy of their customer and business information.

Plaintiffs took several protective steps to secure their compilations of client data. First, Plaintiffs required EFSs to sign confidentiality agreements, which obligated EFSs to keep all client and financial information confidential both during and after employment. *See* Def.'s Resp. to Pls.' Statement of Additional Facts, at ¶¶ 5–7 (Dckt. No. 297). Second, Plaintiffs secured their information by limiting access to users with unique usernames and passwords and permitting access only on a secure company network. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 22 (Dckt. No. 278). Third, Plaintiffs required employees and independent contractors to take compliance courses and undergo training about handling confidential information. *See* Klink Dep., at 150:22 – 151:4 (Dckt. No. 243-1).

A jury could find these measures reasonable and sufficient for trade secret protection. *See, e.g.*, *Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, 2018 WL 636769, at *4 (N.D. Ill. 2018) (requiring third parties to sign nondisclosure agreements is a sufficient measure for trade secret protection); *SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at *6 (N.D. Ill. 2010) (finding plaintiff took reasonable efforts to maintain the secrecy of its information by: (1) requiring employees to sign secrecy agreements, (2) implementing password protection for

37

important files and granting access to different documents based on employees' duties, (3) instructing employees not to share databases with customers, and (4) only sharing information with customers after the customers signed nondisclosure agreements); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 866 (N.D. Ill. 2001) (finding information confidential where the company "maintain[ed] the secrecy of such information through such means as limited access and password-protected computer databases"); *United States v. Hanjuan Jin*, 833 F. Supp. 2d 977, 1008 (N.D. Ill. 2012) ("The Court concludes that this multi-pronged approach to security – controlled and monitored physical access to [the company's] facilities, limited access to the [company's] computer network and [] network equipment, a specific policy for the protection of proprietary information, and confidential agreements and trainings for [company] employees – was a reasonable way to maintain the secrecy of the information.").

Still, Ameriprise argues that Plaintiffs have not done enough. *See* Def.'s Mem. in Support of Summ. J., at 12 (Dckt. No. 242). Ameriprise raises three points here.

First, Ameriprise argues that Plaintiffs' own policy allowed EFSs to bring over certain clients to their next employer. *See* Def.'s Mem. in Support of Summ. J., at 13 (Dckt. No. 242). Specifically, the EFS Manual authorized former EFSs to solicit clients for whom they wrote securities business before working for Allstate. *Id.* at 13, 3; *see also* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 14 (Dckt. No. 271). Ameriprise argues that Plaintiffs cannot seek to protect customer information that they expressly permitted former employees to retain.

The EFS Manual's "prior client" exception may undermine Plaintiffs' efforts at secrecy, but that's for a jury to decide. For now, it is sufficient to note that Ameriprise offers no evidence suggesting that the trade secrets or client information at issue in this case fall within this

exemption.  That is, no evidence shows that Plaintiffs seek to protect information of customers for whom former EFSs wrote securities business before working for Allstate.

Second, Ameriprise argues that Plaintiffs knowingly and regularly disclosed customer information to former EFSs after they departed ALIC.  *See* Def.'s Mem. in Support of Summ. J., at 13 (Dckt. No. 242).  Ameriprise points out that former EFSs received reports detailing active policies and identifying policyholders' names when Allstate sent post-termination commissions.  *Id.*  EFSs could also access client information though AFS.  *Id.*  According to Ameriprise, these disclosures destroy the information's trade secret status.

Ameriprise's argument ignores the EFSs' confidentiality agreements.  Plaintiffs disclosed customer information to current or former EFSs, all of whom signed and agreed to the terms of the confidentiality agreements.  Those agreements bound an EFS even after leaving the company.  *See* EFS Agreement, at 4 (Dckt. No. 243-2).

Plaintiffs didn't send out post-termination commission reports willy-nilly.  The reports did not arrive as a mailer addressed to everyone on the block.  Instead, Plaintiffs sent them only to former EFSs.  And every former EFS who received reports with client-identifying information after leaving ALIC still had to keep that information secret.

More generally, limited disclosure of otherwise confidential information does not destroy trade secret status if the company took reasonable protective measures.  *See Vendavo*, 397 F. Supp. 3d at 1137 ("The question is whether Plaintiff shared information for which it now seeks trade protection *without having* an NDA in place.") (emphasis added); *cf. Ruckelshaus*, 467 U.S. at 1002 ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his

39

property right is extinguished.").  And as already discussed, the confidentiality agreements constitute a reasonable effort to maintain secrecy.

Third, and last, Ameriprise contends that Plaintiffs have willingly disclosed client information in two ways.  For one, Plaintiffs published client first names and last initials on testimonials on Allstate's website.  *See* Def.'s Mem. in Support of Summ. J., at 13 (Dckt. No. 242).  For another, Plaintiffs filed confidential client information in public court filings in previous litigation.  *Id.* at 13–14.

As to the testimonials, publishing a handful of clients' first names and last initial doesn't move the needle as a matter of law.  Again, "a limited disclosure does not destroy all trade secret protection."  *Life Spine*, 8 F.4th at 540.  Releasing a client's first and last name doesn't disclose the identity of an individual in a traceable way.  And this limited identifying information  barely scratches the surface of the panoply of customer-related information – *e.g.*, age, date of birth, policy history – that Plaintiffs seek to protect.

As to the court filings, Ameriprise cites no authority showing that an inadvertent unsealed court filing destroys information's trade secret status as a matter of law.  The case Ameriprise cites, *Seng-Tiong Ho v. Taflove*, has few parallels to this case.  648 F.3d 489, 493 (7th Cir. 2011).  *Taflove* involved the alleged misappropriation of a mathematical model.  But there, the Seventh Circuit found that plaintiffs didn't take reasonable measures to ensure secrecy because they intentionally published their research in formal academic papers twice.  *Id.* at 504.

Here, Allstate's filing of client information was accidental.  *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 46 (Dckt. No. 271).  Perhaps more importantly, the disclosure was limited – and the court in that case retroactively sealed the documents.  *Id.*  Given the inadvertent and temporary nature of this disclosure on PACER, the Court concludes that whether Plaintiffs'

40

filings destroyed the information's trade secret status is a genuine issue of material fact. Plaintiffs might have done more to protect their secrets, but that question is for the jury to decide. *See Learning Curve Toys*, 342 F.3d at 725–26.

In sum, the Court concludes that a jury could find that Plaintiffs took reasonable efforts to maintain the secrecy of their trade secret information.

### B. Misappropriation

Having assessed the nature and protectability of Plaintiffs' alleged trade secrets – the first element of the DTSA analysis – the Court turns to the second element that Plaintiffs must prove. The question is whether Plaintiffs came forward with sufficient evidence that Ameriprise misappropriated a trade secret.

A plaintiff can show misappropriation either through: (1) "an acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or (2) the "disclosure or use of a trade secret without express or implied consent." *See* 18 U.S.C. § 1839(5)(A)–(B). "Improper means" include: "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *See* 18 U.S.C. § 1839(6)(A). "Reverse engineering, independent derivation, or any other lawful means of acquisition" aren't improper means. *See* 18 U.S.C. § 1839(6)(B).

Ameriprise argues that Plaintiffs cannot establish misappropriation because remembering contacts, and making unsolicited and mistaken submissions, are not evidence of misappropriation. *See* Def.'s Mem. in Support of Summ. J., at 15–17 (Dckt. No. 242).

For their part, Plaintiffs argue that Ameriprise has both acquired their trade secrets and used them. So, the Court will assess each alternative in order.

But in short:  Plaintiffs provide enough direct and circumstantial evidence of misappropriation to create a genuine issue of material fact for trial.  There is enough evidence to get to trial.  But the evidence is not so one-sided that Plaintiffs are entitled to summary judgment, either.

### 1.      Acquisition

Plaintiffs argue that Ameriprise knew that it had no rights to the customer information but requested and collected it anyway.  *See* Pls.' Mem. in Support of Summ. J., at 11 (Dckt. No. 238).  Ameriprise recruited Plaintiffs' EFSs, who had trade secrets at their fingertips, and induced them to bring over confidential information to Ameriprise.  That is, Ameriprise got EFSs to breach their confidentiality agreements to acquire Plaintiffs' trade secrets.

Viewing the evidence in the light most favorable to Ameriprise (as the non-movant on Plaintiffs' motion), however, a jury could find that Ameriprise's acquisition of Allstate trade secret information was either unintentional or expressly allowed under the terms of the EFS Agreement.  So, a genuine issue of material fact exists as to whether Ameriprise improperly acquired Allstate trade secrets.  That's enough to get to trial.

No one disputes that Ameriprise knew about EFSs' confidentiality obligations to Allstate.  During Ameriprise's onboarding process, it asked recruits to send their new Ameriprise Field Leader any agreements they had with their former employers.  *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 45 (Dckt. No. 278).  If a recruit had a noncompete or non-solicit agreement, Ameriprise instructed the recruit to "alert us right away" so that the recruit and Ameriprise personnel could "formulate a strategy."  *Id.*

So, Ameriprise personnel had seen the EFS Agreement and reviewed its terms many times over. Ameriprise does not deny this fact. The company knew that ex-EFSs could not solicit certain customers for a year.

But beyond that, factual disputes abound. Plaintiffs' story is that – despite knowing of the EFS Agreement – Ameriprise requested or incentivized recruits to produce confidential information, such that Ameriprise knew that it was receiving trade secret information. That story requires inferring improper acquisition. And such inference is the province of the jury at trial. *See Martinez v. City of Chicago*, 900 F.3d 838, 846 (7th Cir. 2018).

Plaintiffs take issue with two Ameriprise recruitment and onboarding procedures: (1) the due diligence phase, and (2) the holiday list preparation. Plaintiffs argue that the materials Ameriprise requested during these procedures prove that Ameriprise knew that Allstate customer lists and account information were "being pulled directly from Allstate's internal databases because that is exactly what Ameriprise was requesting." *See* Pls.' Mem. in Support of Summ. J., at 12 (Dckt. No. 238).

Ameriprise paints a different picture. To Ameriprise, any acquisition of Allstate trade secrets was either inadvertent or entirely innocent. It makes three points in support.

First, Ameriprise points out that it asks incoming financial advisors to prepare "holiday lists" of contacts from *memory*, and to use public directories and databases to find contact information for those potential customers. *See* Def.'s Mem. in Support of Summ. J., at 15 (Dckt. No. 242). Ameriprise isn't asking for Allstate's clients, but rather for an EFS's close personal contacts. As Ameriprise sees it, an EFS remembering their close friends is not misappropriation.

Second, Ameriprise argues that it doesn't commit misappropriation by receiving unsolicited and accidental submission of trade secrets. Ameriprise acknowledges that "there

have been sporadic instances" of ex-EFSs failing to redact client information from documents submitted in the recruitment process.  *Id.* at 16.  But the company asserts that any inadvertently disclosed client information was not used to solicit clients or for any other purpose.  *Id.*

Ameriprise further argues that no evidence shows that it induced recruits to submit those documents.  *Id.*  In fact, Ameriprise stresses, the company expressly directs prospective employees *not* to supply confidential information.  *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 17 (Dckt. No. 277).

Third, Ameriprise argues that it did nothing to acquire the alleged misappropriated information that was the subject of two earlier lawsuits involving individual EFSs.  *See* Def.'s Mem. in Support of Summ. J., at 17 (Dckt. No. 242).  According to Ameriprise, "no one at Ameriprise directed or encouraged [ex-EFSs] to do the acts about which ALIC complained."  *Id.*

The Court first considers the holiday lists.  As a reminder, Ameriprise's Non-Protocol Transition Guide directs new advisors to assemble "holiday lists" of "[a]cquaintances, friends, [and] family" based on memory and publicly available sources of information.  *See* Def.'s Statement of Facts, at ¶¶ 36–37 (Dckt. No. 241).  The lists consist of "[a]nyone that the advisor would normally send a holiday card to."  *Id.* at ¶ 37.  Ameriprise insists that it instructed new advisors to complete their lists from memory.  *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 18 (Dckt. No. 277).

The parties spill much ink over whether the ex-EFSs in fact compiled the customer lists sent to Ameriprise from memory.  To be sure, memorizing customer lists wouldn't leave the ex-EFS scot-free.  "Memorization is one manner in which a trade secret may be misappropriated."  *First Fin. Bank*, 71 F. Supp. 3d at 845.

But that question doesn't resolve the issue. Former EFSs are not defendants in this lawsuit. Ameriprise is. And Ameriprise isn't liable simply because ex-EFSs misappropriated a trade secret. Instead, Ameriprise's liability hinges on whether it acquired Allstate client information *knowing or with reason to know* that it was acquired by improper means, or whether it disclosed or used client information after using improper means to acquire it. *See* 18 U.S.C. § 1839(5)(A), (5)(B)(i).

On this front, Plaintiffs offer enough evidence to get to a jury, but not enough to avoid one. They argue that Ameriprise knew and intended that a departing EFS would compile the list, not from memory, but from Allstate databases. Plaintiffs point to several pieces of evidence in support.

The first involves timing. Ameriprise instructs outgoing EFSs to send Ameriprise their holiday lists *before* leaving Allstate. *See* Pls.' Resp. to Def.'s Mtn., at 12 (Dckt. No. 270). So, outgoing EFSs prepare their lists while they may access Allstate's customer databases. *Id.*

There's an innocent explanation for this: Ameriprise asks its recruits to create holiday lists early, so that the transition process runs as smoothly and efficiently as possible.

But Plaintiffs allege a sinister motive: Ameriprise has departing EFSs plunder protected trade secrets before heading out the door, while they still have keys to the safe.

The second piece of evidence goes to the volume of information Ameriprise received from recruits. Ameriprise received holiday lists from several former EFSs that contained hundreds of clients' information. *Id.* at 12; *see also* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 43 (Dckt. No. 271); Taubman Client List (Dckt. No. 243-69) (containing over 500 names); Dawson Client List (Dckt. No. 273-18, at 7–9 of 9) (containing more than 100 names). Plaintiffs argue that the sheer number of clients EFSs included in their holiday lists shows that Ameriprise

had reason to know that EFSs were stealing Allstate client information, not compiling lists from memory.

In fact, evidence suggests that an EFS confirmed to Ameriprise that he had downloaded information straight from Allstate databases. In one email, departing EFS Robert Olvera seemingly told Ameriprise that he pulled a spreadsheet of data on over 100 customers – complete with last name, middle initial, first name, address, home phone, cell phone, email, date of birth, product type, and estimated value – from Allstate databases. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 41 (Dckt. No. 271). He told Ameriprise that he was submitting the information "with Allstate sensitive data deleted." *Id.*; *see also* Olvera Email (Dckt. No. 273-19, at 2 of 14).

The third piece of evidence relates to *how* Ameriprise requested to receive the holiday lists. Plaintiffs argue that Ameriprise didn't just ask recruits to jot down a few names from memory and send them over. Instead, Ameriprise directed recruits to put their holiday lists in spreadsheet format, providing a host of identifying information. Given this explicit instruction, Plaintiffs assert that "it was no surprise to Ameriprise when it received client lists directly from Allstate's system." *See* Pls.' Resp. to Def.'s Mtn., at 12 (Dckt. No. 270).

For example, in one email to ex-EFS Scott Taubman, senior Ameriprise recruitment managers asked Taubman to send them an "Excel mergeable file" "with mailing list for announcement card." *See* Def.'s Resp. to Pls.' Statement of Additional Facts, at ¶ 41 (Dckt. No. 297). In an email to another departing EFS still affiliated with Allstate, a recruitment manager expressly requested that the spreadsheet of client information include columns for first name, last name, street address, city, state, and zip code. *Id.* And on one occasion, an Ameriprise recruiting manager asked an EFS to provide a "Global Client list" so that Ameriprise could "complete a review of [his] business." *Id.* at ¶ 32; *see also* 11/1/16 Cardinal Email, at 2 (Dckt.

46

No. 243-34).  Plaintiffs argue that these kinds of specific requests effectively asked EFSs to download spreadsheets of Allstate customer information to send to Ameriprise as "holiday lists."[6]

There is some evidence that happened.  In a November 2016 email, departing EFS Olvera informed his Ameriprise recruiter that "[t]he Allstate System would not allow the pages to be printed," and that he "had to capture via a screen shot for all my accounts."  *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 64 (Dckt. No. 278).  Additionally, ex-EFS Taubman illegally downloaded and transferred Allstate confidential information to a personal flash drive while compiling his client list to send to Ameriprise.  *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 43 (Dckt. No. 271).

Ameriprise disputes these facts, and casts Plaintiffs' evidence as a series of scattered, isolated incidents.  *See* Def.'s Mem. in Support of Summ. J., at 16 (Dckt. No. 242); *see also* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 16 (Dckt. No. 277).  In Ameriprise's view, "While there have been sporadic instances in which five Ex-EFSs failed to redact client names from commission statements and other documents . . . there is no evidence that Ameriprise induced them to provide those five documents, that the submission of the commission statements was intended for any competitive purpose, or that the information was used in any competitive manner."  *See* Def.'s Mem. in Support of Summ. J., at 16 (Dckt. No. 242).

Ameriprise stresses that it "expressly directs financial advisors not to take client-specific information from their prior firm."  *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 17

---

[6] Plaintiffs also assert that "the other customer lists taken by EFSs and provided to Ameriprise have the same striking similarities to the customer lists that can be downloaded from Allstate's proprietary systems."  *See* Pls.' Mem. in Support of Summ. J., at 13 (Dckt. No. 238).  But, despite the reams of discovery produced in this case, Plaintiffs do not cite any example of a customer list such as it exists on Allstate's proprietary systems.  Allstate's argument is supported by nothing, so it counts for nothing.  The Court does not consider the format of any client list as evidence of misappropriation.

(Dckt. No. 277). As Ameriprise sees it, a few inadvertent disclosures from EFSs amount to only "assumptions and speculation" of misappropriation on its part. *Id.*

Ameriprise sets the bar too high. Direct evidence is not required to find misappropriation. Courts have "repeatedly recognized that plaintiffs in trade secret cases can rarely prove misappropriation by convincing direct evidence." *Lumenate Techs., LP v. Integrated Data Storage, LLC*, 2013 WL 5974731, at *5 (N.D. Ill. 2013); *see also PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *15 (N.D. Ill. 1996); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (finding that the jury permissibly drew an inference of misappropriation from circumstantial evidence).

"It is frequently true in trade secret cases that misappropriation and misuse can rarely be proved by convincing direct evidence." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001) (cleaned up). "In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place." *Id.* "[C]ircumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases." *JTH Tax LLC v. Grabowski*, 2021 WL 3857794, at *6 (N.D. Ill. 2021); *see also PolyOne Corp. v. Lu*, 2018 WL 4679577, at *11 (N.D. Ill. 2018).

Here, Plaintiffs have produced circumstantial evidence suggesting that Ameriprise knew or had reason to know that the customer information it received from EFSs was improperly acquired. Plaintiffs' evidence suggests that Ameriprise asked departing EFSs to provide spreadsheets of client contact information while still affiliated with Allstate. *See Inventus Power, Inc. v. Shenzhen Ace Battery Co., Ltd.*, 2020 WL 3960451, at *11 (N.D. Ill. 2020) (holding that evidence that former employees engaged in suspicious mass downloads before

joining defendant led to a reasonable inference "that the alleged theft of [plaintiff's] trade secrets was directed by Defendant employees").

Ameriprise's general instruction to incoming financial advisors "that they must prevent client-identifying information from being submitted" does not change the result or immunize the company from liability. *See* Def.'s Statement of Facts, at ¶ 25 (Dckt. No. 241). By Plaintiffs' account, Ameriprise provides this instruction to incoming financial advisors but fails to enforce or monitor compliance with its policies. *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 35 (Dckt. No. 271). Plaintiffs say the Guide is lip service.

A reasonable jury could agree with Plaintiffs based on the circumstantial evidence they have produced. Viewed in the light most favorable to Plaintiffs, the evidence suggests that Ameriprise may have said "don't steal confidential information" out loud, but its actions encouraged outgoing EFSs to take as much as they could carry.

True, Plaintiffs' circumstantial evidence doesn't propel them to victory on their motion for summary judgment. Perhaps the jury will believe Ameriprise, and credit its instruction to EFSs not to submit confidential information. And the jury could find that Ameriprise had no reason to know that EFSs were sending Plaintiffs' trade secrets improperly.

But those questions are for a jury to decide. At summary judgment, Plaintiffs "do[] not have to meet a burden of being 'likely to prevail,' but need only show that a reasonable jury *could possibly allow* them to prevail." *Tempco Elec. Heater Corp. v. Temperature Eng'rg Co.*, 2004 WL 1254134, at *9 (N.D. Ill. 2004) (emphasis in original). And "the nonmoving party may withstand summary judgment even if they present exclusively circumstantial evidence." *Id.* So, Plaintiffs' lack of direct evidence of misappropriation does not doom their claim at this stage. Instead, Plaintiffs' circumstantial evidence is enough to get them before a jury.

2.     **Use**

Acquisition is not the only way to show trade secret misappropriation under the DTSA.

Use also counts.  *See* 18 U.S.C. 1839(5)(B); *see also Vendavo*, 397 F. Supp. 3d at 1138.  And

Plaintiffs argue that "[t]here is no shortage of evidence" that Ameriprise used and continues to

use the customer information.  *See* Pls.' Mem. in Support of Summ. J., at 14 (Dckt. No. 238).

The Defend Trade Secrets Act does not provide a remedy for any use of a trade secret.

Instead, the person who uses the secret must fall into one of three categories.  The use must be

"without express or implied consent" and "by a person who –

> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was –
>
>> (I) derived from or through a person who had used improper means to acquire the trade secret;
>>
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that –
>
>> (I) the trade secret was a trade secret; and
>>
>> (II) knowledge of the trade secret had been acquired by accident or mistake.

*See* 18 U.S.C. § 1839(5)(B)(i)–(iii).

There is a genuine issue of material fact as to whether Ameriprise used Plaintiffs' trade

secrets.

In a colloquial sense, Ameriprise makes use of the "holiday lists" sent by incoming

financial advisors.  An Ameriprise "transition team" sent announcement cards to customers on

the holiday lists notifying them of the EFSs' new affiliation with Ameriprise.  *See* Def.'s Resp.

to Pls.' Statement of Facts, at ¶¶ 85–86 (Dckt. No. 278). The transition team also made packets for certain clients on the list to send immediately upon the EFS's transition, and it kept track of clients who were contacted and transferred their business to Ameriprise. *Id.* at ¶¶ 85–86, 98–99. Those clients ended up in Ameriprise's customer database. *Id.* at ¶ 106.

But Plaintiffs can't just show that Ameriprise used the trade secrets in a colloquial sense. "Use" must fall within the meaning of the DTSA.

Under the DTSA, a defendant may appropriate a trade secret by using it while knowing or having reason to know that it was derived from a person who used improper means to acquire it. *See* 18 U.S.C. § 1839(5)(B)(ii)(I). A defendant can also misappropriate through use after itself acquiring the trade secret though improper means. *See* 18 U.S.C. § 1839(5)(B)(i).

A reasonable jury could find Ameriprise's use through either means. The jury could find that former EFSs solicited Allstate clients on Ameriprise's behalf using stolen trade secrets and that Ameriprise knew or had reason to know that EFSs were breaching their confidentiality agreements in doing so.

A reasonable jury could also find that Ameriprise itself used improper means to acquire Allstate's trade secrets. The jury could find that Ameriprise, through its onboarding and announcement process, improperly induced EFSs to supply it with confidential Allstate information.

Plaintiffs again weave together circumstantial evidence. The thrust is that Ameriprise developed an aggressive announcement strategy that effectively induced EFSs to provide it with Allstate trade secrets, then Ameriprise put those secrets to use by soliciting Allstate customers to switch to Ameriprise.

The goal was getting customers to jump over to Ameriprise. For example, Ameriprise's 30(b)(6) witness testified that Ameriprise encouraged transitioning EFSs to review their holiday lists and "develop[] a communication strategy" for contacting clients upon leaving Allstate. *See* Mostrom Dep., at 78:17-21 (Dckt. No. 243-21, at 10 of 13).

Before an EFS's transition, Ameriprise recruitment managers would also instruct the incoming advisor to "[i]dentify the order in which you plan to call your clients," and to "call the top twenty by relationship." *See* Exhibit 36, at 3 (Dckt. No. 243-29). On the date of the EFS's resignation from Allstate, Ameriprise told the new advisor to "[b]egin calling your clients in the order you identified earlier." *Id.* One Ameriprise transition team employee reported that an ex-EFS, on his first day, "had already spoken to a lot of clients over the weekend and says he has about $20 mil committed to move." *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 107 (Dckt. No. 278).

Again, Ameriprise casts Plaintiffs' evidence as only "stray citations." *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 19 (Dckt. No. 277). "Plaintiffs ask this Court to thread together statements from different documents sent to different EFSs in different years . . . to create a false narrative of misappropriation and misconduct." *Id.* at 20.

The strength of Plaintiffs' evidence is for a jury to decide. For now, Plaintiffs have put forward enough evidence for a jury to reasonably conclude that Ameriprise directed former Allstate employees to put Plaintiffs' trade secrets to use for its benefit. While this circumstantial evidence is not enough for the Court to grant summary judgment for Plaintiffs, it is enough to get them to trial.

### 3. Liability for Securities Products Sales

Ameriprise also asks for summary judgment barring any securities product or client claim. *See* Def.'s Mem. in Support of Summ. J., at 27–28 (Dckt. No. 242). That is, Ameriprise contends that Plaintiffs cannot recover for any misappropriation related to financial products.

The Court grants summary judgment, but makes a note. Plaintiffs do not sell securities products. They have admitted that they "do not (and cannot) seek damages or relief against Ameriprise that arise out of or relate to the sale of financial products." *See* Pls.' Resp. to Def.'s Statement of Facts, at ¶ 19 (Dckt. No. 271). So, they cannot seek damages for the sale of products they do not sell.

But this ruling doesn't prevent Plaintiffs from seeking damages for the misappropriation of their client information, even if Ameriprise used that information to sell a securities product. Unjust enrichment caused by the misappropriation of trade secrets is recoverable. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II).

Put another way, the fact that Plaintiffs do not themselves sell securities does not prevent them from succeeding on a misappropriation claim against a company that does. An apple farm may recover damages for misappropriation of its information by an orange farm, even if the orange farm used that information to sell oranges instead of apples. "[T]he harm that results from wrongful misappropriation of information results from the defendant's use of that information." *SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at *8 (N.D. Ill. 2010); *see also id.* ("Defendants are mistaken in asserting that [plaintiff] can recover no damages unless it proves a causal link between the customers who left . . . and Defendants' misappropriation of trade secrets. Even if [plaintiff] cannot prove such a link, it is still entitled to damages for the harm of the misappropriation of its trade secrets . . . .").

## C.       Temporal Scope of the DTSA Claims

Finally, Ameriprise asks this Court to narrow the scope of any DTSA claim in this case.

The DTSA applies to "any misappropriation of a trade secret . . . for which any act occurs on or after the date of the enactment" of the DTSA, meaning on May 11, 2016.  *See* Defend Trade Secrets Act of 2016, Pub. L. 114-153, 130 Stat. 376 (May 11, 2016).  So, to succeed under the Act, a plaintiff must prove that a defendant's misappropriation occurred on or after May 11, 2016.

But courts have not read the DTSA to preclude all claims in which misappropriation began before the statute's enactment.  Rather, courts have roundly interpreted the DTSA's effective date limitation to include use that occurred before – but *continued after* – DTSA's enactment.  *See Attia v. Google, LLC*, 983 F.3d 420, 424–25 (9th Cir. 2020) ("[T]he misappropriation of a trade secret before the enactment of the DTSA does not preclude a claim arising from post-enactment misappropriation or continued use of the same trade secret."); *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, 2017 WL 1105648, at *2 (E.D. Pa. 2017) ("Other district courts have analyzed the applicability of the DTSA to misappropriations that occurred before the DTSA was enacted.  These courts have all held that the DTSA applies to misappropriations that began prior to the DTSA's enactment if the misappropriation continues to occur after the enactment date."); *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 2016 WL 5391394, at *6 (M.D. Fla. 2016).  Put differently, pre-DTSA misappropriation does not necessarily preclude a DTSA claim if the plaintiff can show that some form of misappropriation also occurred *after* the DTSA's effective date.

The Seventh Circuit has yet to address the issue.  But several courts in this district – including the presiding Magistrate Judge in the case at hand – have adopted the same

54

interpretation. *See Motorola Sols., Inc. v. Hytera Commc'ns Cop. Ltd.*, 436 F. Supp. 3d 1150, 1165–66 (N.D. Ill. 2020) ("[The DTSA's] broad language, coupled with the omission of the provision in the Uniform Trade Secret Act limiting such recovery, support the position that 'use' in this case occurring after effective date serve as a proper basis for this action."); *see also Allstate Ins. Co. v. Ameriprise Fin. Servs., Inc.*, 2018 WL 11355025, at *3 (N.D. Ill. 2018) (Kim, M.J.) ("[T]he courts that have addressed this issue have interpreted the DTSA to permit claims to include alleged misappropriation if the initial use occurred before the DTSA enactment date but the improper use continued thereafter.").

This Court joins the consensus. An act of misappropriation that began before May 11, 2016, is actionable only if the defendant continued using the trade secret after that date. Misappropriation that began and ended before May 11, 2016 is precluded.

Ameriprise argues that the DTSA's effective date provision significantly limits Plaintiffs' claims. *See* Def.'s Mem. in Support of Summ. J., at 28 (Dckt. No. 242). Plaintiffs' DTSA claims may only proceed to the extent that they "arise from genuine issues of fact that specific trade secrets were misappropriated – that is, acquired or used – on or after May 11, 2016." *Id.*

According to Ameriprise, "the only Ex-EFSs whose transition from ALIC to Ameriprise could possibly fall within the ambit of Plaintiffs' DTSA claims" are those EFSs who transferred after May 11, 2016 – Robert Olvera, Scott Taubman, Robert Larson, and Jason Meek. *Id.* Conversely, any clients in common who transferred business to Ameriprise before the DTSA's effective date are barred from this case because there is no evidence of continued "use" during the DTSA's effective period. *Id.*

Plaintiffs agree that the effective date provision governs their claims. *See* Pls.' Resp. to Def.'s Mtn., at 28 (Dckt. No. 270). However, they argue that Ameriprise's misappropriation of

their trade secrets continued after the DTSA's effective date. In other words, although customer and business information may have been *acquired* before May 11, 2016, "Ameriprise continued to *use* the stolen information after May 2016." *See* Pls.' Resp. to Def.'s Mtn., at 28–29 (Dckt. No. 270) (emphasis added).

Here, the Court finds that Plaintiffs have put forward evidence of continued use after the DTSA's effective date. But the Court first notes what does *not* amount to continued use under the DTSA. Plaintiffs contend that Ameriprise's continued use took the form of "incorporation of the Allstate confidential information into its databases and Ameriprise's continued service of and sales to the stolen Allstate customers." *Id.* at 29. Not so.

Ameriprise putting client information into its customer databases does not alone supply the basis for finding continued use in the future. Inputting trade secrets into a database is at best a discrete act of use, or a form of acquisition. That act begins, and ends, once the information enters the database.[7]

Mere presence of trade secrets in a defendant's database cannot amount to continued use in perpetuity. Liability for "use" under the DTSA would transform into liability for "possession" – a word Congress did not choose. *See Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 550 (7th Cir. 2013) (courts interpreting statutes must "accord words and phrases their ordinary and natural meaning and avoid rendering them meaningless, redundant, or superfluous," and must "view words not in isolation but in the context of the terms that surround them").

---

[7] Plaintiffs implicitly acknowledge this point, noting that putting customer information on Ameriprise databases merely facilitates future use. *See* Pls.' Mem. in Support of Summ. J., at 15 (Dckt. No. 238) ("Ameriprise immediately uses that customer list . . . by . . . incorporating these clients into Ameriprise databases and systems for *future use*.") (emphasis added); *id.* ("Obviously, once incorporated into Ameriprise databases, the bell has been rung, as that information is available for the repeated use of Ameriprise to dip into for recurrent contacts with Allstate clients . . . .").

Even so, Plaintiffs put forward sufficient evidence of Ameriprise's continued use of their trade secrets. Simply put, Ameriprise has continued to service and sell insurance products to the stolen Allstate customers. *See* Pls.' Resp. to Def.'s Mtn., at 29 (Dckt. No. 270). That's use.

Plaintiffs assert that "Ameriprise admits that there are over 200 customers in common (based on an attorney-created list), many of which are *currently* being serviced by the former EFSs at Ameriprise. *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 17 (Dckt. No. 292). "The transitioned EFSs, and now Ameriprise, use those customer lists in the operation of the competing business." *Id.*

To be sure, Plaintiffs' gesture to the clients-in-common list is vague. But that list conclusively establishes that at least some former ALIC clients have active policies with Ameriprise. *See* Clients in Common (Dckt. No. 247-40). Ameriprise continues to service and sell to those customers.

Plaintiffs may therefore proceed on their misappropriation claims as to these clients. Plaintiffs may also proceed as to the misappropriation associated with EFSs who transitioned to Ameriprise after the DTSA's effective date, May 11, 2016. Those EFSs are Robert Olvera, Scott Taubman, Robert Larson, and Jason Meek. *See* Def.'s Statement of Facts, at ¶ 6 (Dckt. No. 241); *id.* at ¶ 105 (showing Olvera transition date of January 13, 2017); *id.* at ¶ 106 (showing Taubman and Larsen transition date of March 10, 2017); *id.* at ¶ 114 (showing Meek transition date of April 8, 2017).

Plaintiffs may not, however, seek liability for any misappropriation relating to a client in common who terminated an Ameriprise policy before May 11, 2016. For these clients in common, Ameriprise made no use after the DTSA's effective date. Plaintiffs have not shown a

genuine dispute of material fact as to Ameriprise's continued use of such customer information and may not seek liability for this misappropriation at trial.

*     *     *

In sum, Plaintiffs' motion for summary judgment on the Defend Trade Secrets Act claim is denied, and Defendant's motion is denied in large part. There is a genuine dispute of material fact as to whether Plaintiffs' customer and business information qualifies as a trade secret and as to whether Defendant misappropriated any of Allstate's trade secrets. The evidence in the record is sufficient to get the Plaintiffs to trial.

But Plaintiffs may not make claims relating to Stephen Caruso. And they may not bring any claims for misappropriation stemming from a client who terminated an Ameriprise policy before May 11, 2016.

## III.    Tortious Interference with Business Relationships (Count II)

Next, Plaintiffs claim that Ameriprise tortiously interfered with "business relationships." *See* Cplt., at ¶¶ 127–38 (Dckt. No. 1). Before diving into the merits, the Court must pin down what that claim (or, as it turns out, *claims*) means.

Illinois law recognizes two types of tortious interference claims: (1) tortious interference with contract, and (2) tortious interference with prospective economic advantage. Their names signal their differences.

Tortious interference with contract is about a third-party's interference with an *existing* contract. *See Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018). On the other hand, tortious interference with prospective economic advantage is about a third party's interference with a *reasonable expectation* of a business relationship. *See Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015).

In their complaint, Plaintiffs allege the tort of "tortious interference with business relationships." *See* Cplt., at Count II (Dckt. No. 1). "In Illinois, the terms tortious interference with prospective economic advantage, business expectancy, and business relations are interchangeable." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 807 n.30 (N.D. Ill. 2011).

So, initially, it looks like Plaintiffs allege tortious interference with prospective economic advantage claim. "Tortious interference with business relationships" sounds a lot like the synonyms for tortious interference with prospective economic advantage.

But Plaintiffs' complaint also alleges interference with both current and potential contracts. Specifically, they claim that "Ameriprise intentionally and unjustifiably interfered, and continues to interfere, with ALIC's business relationships with its customers and/or prospective customers by instructing and encouraging EFS to violate their EFS Agreements." *See* Cplt., at ¶ 134 (Dckt. No. 1). And they argue that "Ameriprise also knew and understood that ALIC expected the EFSs who terminated their respective EFS Agreements and subsequently joined Ameriprise to honor their EFS Agreements." *Id.* at ¶ 137. So, despite their labeling, Plaintiffs seem to plead both tortious interference with existing contracts and with prospective relationships.

And in their motion for partial summary judgment, Plaintiffs again discuss existing and potential contracts. Their header for the tortious interference subject declares "There Is No Dispute of Material Fact that Ameriprise Tortiously Interfered with Allstate's Business Relationships and Contracts." *See* Pl.'s Mem. in Support of Partial Summ. J., at 17 (Dckt. No. 238). And they double down within that section. *See, e.g.*, *id.* at 25 ("[S]uch direction amounts to tortious interference with Allstate's contracts and business relationships"); *id.*

59

("Ameriprise also tortiously interfered with Allstate's business relationships and contracts with its EFS by assisting the EFSs with the transition of their Allstate clients to Ameriprise.").

Ameriprise thinks that Plaintiffs are pulling a fast one. It thinks that Plaintiffs only ever alleged a claim for tortious interference with prospective economic advantage. And now, Ameriprise argues that Plaintiffs are amending their complaint through their summary judgment motion. *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 28 (Dckt. No. 277) ("The Court should reject any attempt by Plaintiffs to retrofit a tortious interference with contract claim into their Complaint . . . leave to amend is unwarranted and prejudicial to Ameriprise at this late date.").

True, switching theories from one tortious interference claim to another is not permissible this late in the game. *See, e.g.*, *ABC Acquisition Co. v. AIP Prods. Corp.*, 2020 WL 4607247, at *18–19 (N.D. Ill. 2020) (noting that "floating one theory for tortious interference" with contract "and then switching it for a theory of tortious interference that focuses on [the plaintiff's] existing business relationships with its customers" created "unfair surprise" for the defendants).

Complaints set the stage for the litigation. They inform defendants of the claims against them and provide guidance for their answer and discovery requests. If plaintiffs start advancing claims outside of their complaints (without amending that complaint), defendants are placed in an unfair position. At some point, targets need to stop moving.

But here, Plaintiffs aren't pulling a bait and switch. Their complaint's labelling was imprecise, but Plaintiffs' actual allegations covered both theories of tortious interference. So, the Court interprets Count II to encompass two claims, one for tortious interference with prospective

60

economic advantage and another for tortious interference with contract.[8]  As a result, the Court will address each in turn.

### A. Tortious Interference with Prospective Economic Advantage

To prove tortious interference with prospective economic advantage, a plaintiff must show: "'(1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.'" *Botvinick v. Rush Univ. Med. Ctr.*, 574 F.3d 414, 417 (7th Cir. 2009) (citation omitted); *see also Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007); *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877–78 (1991). The Court will address each element in turn.

#### 1. Reasonable Business Expectation and Ameriprise's Knowledge

Ameriprise argues that Plaintiffs cannot show reasonable expectations of valid business relationships. *See* Def.'s Mem. in Support of Summ. J., at 18 (Dckt. No. 242).  As Ameriprise sees it, Plaintiffs merely show that some Ameriprise clients previously worked with Allstate. *Id.* at 18–19.  In Ameriprise's view, that track record of past business is not enough to support a reasonable expectation of business in the future. *Id.*

To be sure, "[a] history of filling orders for a particular customer does not, by itself, satisfy the requirement of establishing a reasonable expectancy of receiving additional orders from that customer." *PCM Sales, Inc. v. Reed*, 2017 WL 4310666, at *12 (N.D. Ill. 2017)

---

[8]  Plaintiffs are allowed to plead both claims in the same count.  *See Leonel & Noel Corp. v. Cerveceria Centro Americana, S.A.*, 758 F. Supp. 2d 596, 605 (N.D. Ill. 2010) ("GKS takes issue with Tikal's failure to plead its tortious interference with contract and business expectancy claims in separate counts in the complaint.  The rule in this circuit does not require Tikal to have done so.") (citing *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992)).

(quoting *U.S. Data Corp. v. RealSource, Inc.*, 910 F. Supp. 2d 1096, 1109 (N.D. Ill. 2012)); *see also Automated Concepts, Inc. v. Weaver*, 2000 WL 1134541, at *7 (N.D. Ill. Aug. 9, 2000) ("The fact that [plaintiff] has a 'track record' of receiving work from a particular customer in the past, in and of itself, does not establish a reasonable expectation of [plaintiff's] entering into any particular future business relationship with such a customer."). "A reasonable expectancy requires 'more than the hope or opportunity of a future business relationship.'" *Brinley Holdings Inc. v. RSH Aviation, Inc.*, 580 F. Supp. 3d 520, 556 (N.D. Ill. 2022) (quoting *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007)). So, past dealings with a hope and a prayer for future business won't cut it.

But the record does not conclusively show that Plaintiffs "[m]erely provid[ed] proof of a past customer relationship." *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014). There is more here than just past dealings.

Plaintiffs begin by arguing that ALIC had an expectancy of future business with its existing customers because of the nature of the industry and its business model. ALIC and AIC use a cross-pollination business model. That is, the businesses are "structured in a manner that allows the EFS to partner with AIC agents to cross-sell life insurance and financial products to existing AIC property and casualty clients who have been with Allstate for several years." *See* Pls.' Resp. to Def.'s Mtn., at 15 (Dckt. No. 270).

The Court finds this argument unpersuasive. Plaintiffs merely put a twist on past customer relationships by stating that ALIC and AIC share and sometimes feed each other's clients. While it might make client acquisition easier, that business model doesn't show that ALIC could reasonably expect business from AIC clients down the line.

What does persuade the Court: Plaintiffs' clients had ongoing relationships with ALIC. Several of the 211 clients in common prematurely terminated their Allstate policies after an EFS joined Ameriprise. *See, e.g.*, Def.'s Statement of Facts, at ¶ 35, 44 (Dckt. No. 241). Those clients had active ALIC policies when the EFSs jumped ship.

Contractual business relationships that are terminable at will "presumptively . . . continue in effect so long as the parties [remain] satisfied." *3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000) (quoting *Anderson v. Anchor Org. for Health Maint.*, 654 N.E.2d 675, 685 (1st Dist. 1995)); *see also Reyes v. Walker*, 2018 WL 6062320, at *5 (N.D. Ill. 2018). Thus, where a client relationship is both pre-existing and extends into the future, courts have found valid expectancies of continuing relationships. *3Com*, 104 F. Supp. at 938. Such was the case here.

Additionally, the evidence shows that at least one client was in talks with a then-Allstate EFS to purchase policies – but later bought a product through Ameriprise after the EFS jumped ship. Jeffrey Stillwell confirmed that he was "in the final stages" of negotiating a non-qualified deferred compensation arrangement with a client who would have become an ALIC client had Stilwell not left for Ameriprise. *See* Def.'s Resp. to Pls.' Statement of Additional Facts, at ¶ 35 (Dckt. No. 297); Pls.' Resp. to Def.'s Statement of Additional Facts, at ¶ 16 (Dckt. No. 293). In other words, the client was all but ready to board an Allstate plane, but ended up flying Ameriprise after its flight attendant changed allegiances.

A client's future plans can create reasonable expectancies of business. For example, in *Am. Audio Visual Co. v. Rouillard*, 2010 WL 914970, at *3 (N.D. Ill. 2010), the plaintiff had previously provided audio visual services at the client's annual meeting. The defendant, a former employee of plaintiff's, worked with the client for the next year's meeting, "until the day

she left" for a competitor. *Id.* at *3. She ended up taking the client's business with her. The court found a reasonable expectancy of a business relationship given the company's past relationship and future plans with the client.

Ameriprise contends that Plaintiffs' claims nevertheless fail because Plaintiffs have not shown reasonable expectations of business relationships with *specific* clients. *See* Def.'s Mem. in Support of Summ. J., at 18–20 (Dckt. No. 242). "At most, Plaintiffs merely will present evidence of past client relationships as a basis for their 'expectation' of future business – and that is not enough." *Id.* at 18. According to Ameriprise, "there is no evidence that any *specific* client would have done business with AIC or ALIC, but for the actions of Ameriprise." *Id.* at 19 (emphasis added).

To get past summary judgment, a plaintiff must identify a *specific* third party with whom the plaintiff would have done business but for the defendant's interference. *See Uline, Inc. v. JIT Packaging, Inc.*, 437 F. Supp. 2d 793, 800–01 (N.D. Ill. 2006) (collecting cases); *see also Assoc. Underwriters of Am. Agency, Inc. v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005) ("A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed toward that third party."); *Republic Tobacco, L.P. v. N. Atl. Trading Co., Inc.*, , 254 F. Supp. 2d 1007, 1012 (N.D. Ill. 2003); *Celex Grp., Inc. v. The Executive Gallery, Inc.*, 877 F. Supp. 1114, 1125 (N.D. Ill. 1995) (holding that at summary judgment a plaintiff "must come forward with its evidence and identify particular third parties with whom it had a reasonable expectancy of entering into business").

But as this Court has already discussed, Plaintiffs have done so here. For starters, there is the clients-in-common list. And Stillwell was near the finish line in negotiating a non-qualified deferred compensation arrangement with a would-be ALIC client when he transferred to

64

Ameriprise.  *See* Pls.' Resp. to Def.'s Statement of Additional Facts, at ¶¶ 16–18 (Dckt. No. 293).  He informed Ameriprise of this opportunity.  *Id.*  And when Stillwell jumped over to Ameriprise, that deferred compensation arrangement went with him.  *See* Stillwell Dep., at 166:1-9 (Dckt. No. 243-58).

Likewise, ex-EFS Troy Trahan was apparently successful in transitioning some former Allstate clients to Ameriprise after switching teams.  Emails in evidence note that Trahan "began reaching out to clients immediately and did a large 1300 piece announcement strategy mailer to everyone," but "chose to stop soliciting his clients" after receiving a cease and desist letter from Allstate.  *See* Exhibit 98 (Dckt. No. 243-81, at 6 of 7).  By that time, however, "his A clients had moved over and from an asset standpoint there was very little managed money left."  *Id.*

The Court therefore finds genuine disputes of material fact both as to Plaintiffs' expectancies in its relationships with the clients in common who transferred their business to Ameriprise, and as to Ameriprise's knowledge.

### 2.    Ameriprise's Interference

In Illinois, "proof of tortious interference with economic advantage requires 'a showing that the tortfeasor acted with actual malice.'"  *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1063 (N.D. Ill. 2019) (quoting *Capital Options Invs., Inc. v. Goldberg Bros Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir. 1992)).  Malice goes beyond competitive instinct, and instead involves a defendant acting "with a desire to harm, which was unrelated to the interest [it] was presumably seeking to protect by bringing about the contract breach."  *Int'l Star Registry of*

*Illinois v. ABS Radio Network, Inc.*, 451 F. Supp. 2d 982, 992 (N.D. Ill. 2006) (quoting *Cap. Options Invs., Inc.*, 958 F.2d at 189).

Purposeful interference goes beyond run-of-the mill competitive acts. A competitor swooping in to recruit an employee or spoil the sale is not enough. A plaintiff must prove purposeful interference by showing impropriety. *See Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998) ("[T]o prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference' – that the defendant has committed some impropriety in doing so."); Restatement (Second) of Torts § 766B cmt. a (Am. Law Inst. 1979) ("In order for the actor to be held liable, this Section requires that his interference be improper."). Examples of impropriety include "fraud, deceit, intimidation, or deliberate disparagement." *See Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995).

Competition itself is not a tort. Illinois law recognizes the so-called "competitor's privilege," meaning that a market participant can "act to advance its interests at the expense of its competitor." *See A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1405 (7th Cir. 1992); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 867 (7th Cir. 1999). Competitors can "interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008); *see also Webb*, 906 F.3d at 577 (7th Cir. 2018) ("Since a general duty not to interfere with an individual's business relationships is quite broad, Illinois courts announced that in certain situations, an individual may be privileged to interfere with another's business relationships – for example, in the context of lawful competition."); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1224 (7th

Cir. 1988) ("Legitimate competitive efforts, such as indicating interest in and making offers to acquire a company, are not tortious interferences with business.").

In short, the key is competition through *improper* acts. *See Speakers of Sport*, 178 F.3d at 867 ("[T]he tort of interference with business relationships should be confined to cases in which defendant employed unlawful means to stiff a competitor."); *The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 620 (Ill. App. Ct. 2006) ("[E]ven though competition will justify interference with a business relationship, if the manner of interference is improper, the interference will be actionable.").

Interference is only improper if the defendant accomplishes it through wrongful means, or was motivated by malice, not simply economic self-interest. *See Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 359 F.3d 376, 398 (7th Cir. 2003) ("A defendant is entitled to the protection of the privilege of competition provided that the defendant has not employed a wrongful means or is not motivated solely by malice or ill will."). Wrongful means includes conduct such as "physical violence, fraud, prosecution of civil or criminal suits, violation of business ethics and customs, and unlawful conduct." *See Republic Tobacco*, 254 F. Supp. 2d at 1012 (noting that Illinois follows the Restatement's definition of "wrongful means"); *see also* Restatement (Second) of Torts § 767 cmt. c (Am. Law. Inst. 1979) ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper.").

Here, Ameriprise is correct that there is no evidence of malice. But that only gets it halfway there. A defendant can also incur liability by using wrongful means to interfere. And on that point, genuine issues of fact remain.

Plaintiffs theorize that Ameriprise interfered with its prospective customer relationships through a recruitment and onboarding process that incentivized EFSs to join Ameriprise, leave Plaintiffs, pilfer Allstate's client base, and then solicit those clients. *See* Pls.' Mem. in Support of Summ. J., at 18 (Dckt. No. 238) ("The evidence shows that Ameriprise not only knew and approved of the EFSs breaching their EFS Agreements by taking confidential information and soliciting Allstate clients, it also encouraged, assisted, and incentivized those breaches that resulted in the disruption of hundreds (if not thousands) of Allstate business relationships."); *id.* ("Ameriprise's entire recruitment scheme is indicative of its willful intention to purposefully interfere with Allstate's business relationships . . . ."); *id.* at 20 ("Ameriprise's pre-transition and onboarding procedures also amount to intentional interference with Allstate's business relationships."). Plaintiffs allege that Ameriprise misappropriated their trade secrets through its interference.

As this Court has already discussed, there is a genuine dispute of material fact as to Ameriprise's misappropriation. Misappropriating trade secrets is unlawful conduct amounting to improper interference. *See Advantage Marketing Grp., Inc. v. Keane*, 143 N.E.3d 139, 153 (Ill. App. Ct. 2019) (finding that misappropriation may constitute interference), *appeal denied by* 132 N.E.3d 326 (Ill. 2019); *see also* Restatement (Second) of Torts § 767 cmt. c (Am. Law. Inst. 1979). So, a genuine issue of material fact exists as to whether Ameriprise's interference was improper.

Ameriprise heaves up one last argument. Ameriprise asserts that "Plaintiffs must present evidence that Ameriprise directed its wrongful conduct toward Plaintiffs' *clients*, as opposed to toward *the EFSs*." *See* Def.'s Mem. in Support of Summ. J., at 23 (Dckt. No. 242). And all Plaintiffs have done here is discuss Ameriprise's recruitment and compensation practices –

which were directed toward the EFSs. So, Ameriprise thinks any of its conduct directed toward the EFSs is unactionable.

Ameriprise is correct that, as a general matter, "[t]he tort of intentional interference with prospective economic advantage requires some conduct '*directed toward a third party* through which defendants purposely cause that third party not to enter into or continue' a relationship with the plaintiff." *Hackman v. Dickerson Realtors, Inc.*, 557 F. Supp. 2d 938, 949 (N.D. Ill. 2008) (emphasis added) (quoting *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185 (N.D. Ill. 1982)); *see also Advantage Mktg. Grp., Inc. v. Keane*, 143 N.E.3d 139, 153 (Ill. Ap. Ct. 2019) ("A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed toward that third party.").

However, "courts have not hesitated to hold principals vicariously liable for their agents' torts, including tortious interference with economic advantage." *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1064 (N.D. Ill. 2019); *see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 913 (7th Cir. 1994) (applying Illinois law) (holding that principal may be liable for agent's tortious interference with employment relationship if agent was "acting in furtherance (however misguidedly) of his principal's business"). And here, a reasonable jury could find that the EFSs acted in furtherance of Ameriprise's business when soliciting former Allstate clients to transfer their policies to Ameriprise.

So, the question of Ameriprise's interference will go to a jury.

### 3. Damages

The Court turns to the last element, damages. In short, there is a genuine dispute of material fact as to whether Ameriprise's alleged interference caused damage to Plaintiffs.

Ameriprise asserts that Plaintiffs have not produced any specific clients who transferred their business to Ameriprise *because* of Ameriprise's interference. Ameriprise argues that, for it to be liable, "*Plaintiffs must show that damages exist and were caused by Ameriprise*, even if the amount of damages is determined later." *See* Def.'s Resp. to Pls.' Mem. for Partial Summ. J., at 22 (Dckt. No. 277).

But, as this Court has already discussed, Plaintiffs *do* identify specific clients: the 211 clients in common, plus the deferred compensation arrangement account arranged by Jeffrey Stillwell.

Even so, Ameriprise argues that Plaintiffs have not come forward with evidence of causation. That is, even if 211 former Allstate clients transferred their business to Ameriprise, Plaintiffs have not shown that Ameriprise's action *caused* this loss of business. *Id.*

Plaintiffs admit that they do not have direct evidence of damages. Instead, they ask this Court to "rely on circumstantial evidence to show that Ameriprise caused Allstate damage." *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 21 (Dckt. No. 292).[9]

"[C]ircumstantial evidence alone may be enough to survive a motion for summary judgment on a tortious interference claim." *Knebel Autobody Ctr., Inc. v. Country Mut. Ins. Co., Inc.*, 2017 WL 65444, at *6 (Ill. App. Ct. 2017); *see also Ty, Inc. v. MJC-A World of Quality, Inc.*, 1994 WL 36880, at *6 (N.D. Ill. 1994) (noting that "either direct or circumstantial evidence linking statements attributable to [plaintiffs] to actions by [defendant's] customers" would have been enough to survive summary judgment); *SKF USA Inc. v. Bjerkness*, 2010 WL 3155981, at

---

[9] Plaintiffs also argue that, in moving for partial summary judgment, they "are not required to put forth direct evidence of each dollar of loss caused by Ameriprise." *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 21 (Dckt. No. 292). Exactly right, but beside the point. That requirement (or lack thereof) goes to proof of *the amount* of damage, not *the fact* of damage. True, Plaintiffs may need only prove the amount of damages to a reasonable degree of certainty later, but they must provide evidence creating a genuine issue of material fact as to the existence of damages today.

*8 (N.D. Ill. 2010). So, Plaintiffs must set forth at least circumstantial evidence connecting Ameriprise's tortious interference with its success in acquiring specific former Allstate customers. The question is whether there is any such circumstantial evidence here.

The Court concludes that there is. Ameriprise allegedly induced EFSs to solicit Allstate customers through an announcement strategy that involved misappropriation of Allstate trade secrets to turn Allstate customers into Ameriprise customers. Evidence shows that former Allstate EFSs personally contacted former clients – which a jury could reasonably find amounts to solicitation.

In the end, over 200 former Allstate customers transitioned their business to Ameriprise. Among those were Troy Trahan's "A" clients, who seemingly moved their business right after Trahan's move to Ameriprise and his 1,300-piece announcement. The parties identified 18 of Trahan's clients as clients in common. *See* Def.'s Statement of Facts, at ¶ 101 (Dckt. No. 241). A reasonable jury could find that some of these clients transitioned because of Ameriprise's actions.

Still, evidence suggests that at least some of these clients left Allstate for legitimate reasons unrelated to Ameriprise's conduct. For example, Stillwell testified that he never notified the client to whom he ultimately sold the deferred compensation arrangement – the client reached out to him. *See* Stillwell Dep., at 163:9-15 (Dckt. No. 243-58, at 4 of 5) ("They contacted me after I left."); *id.* at 165:3-9 (Q: "By the way, did Munoz Trucking follow you over to Ameriprise?" A: "They contacted me after I left. I didn't even notify them.") (objection omitted). A jury could credit this testimony.

Other evidence suggests that customers left Allstate because of personal relationship with their financial advisors, not based on Ameriprise's impropriety. *See* Def.'s Statement of Facts, at

¶ 68 (Dckt. No. 241) (client in common was EFS's now ex-husband). Other clients were the financial advisors themselves. *See, e.g.*, Def.'s Statement of Facts, at ¶¶ 57, 71, 84, 89, 101, 108 (Dckt. No. 241).

The Court therefore concludes that a genuine dispute of material fact exists as to the element of damages. Plaintiffs' motion for summary judgment on the tortious interference with prospective economic advantage claim is denied, and Defendant's motion is denied.

### B.     Tortious Interference with Contract

"Tortious interference with a contract occurs when someone intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract." *PrimeSource Bldg. Prods., Inc. v. Huttig Bldg. Prods., Inc.*, 2017 WL 7795125, at *25 (N.D. Ill. 2017) (quoting *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 601 (7th Cir. 2001)).

A claim of tortious interference with contract has five elements: "(1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb*, 906 F.3d at 577; *see also Got Docs, LLC v. Kingsbridge Holdings, LLC*, 2023 WL 2078450, at *8 (N.D. Ill. 2023); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989). "A competitor's privilege to interfere with contracts is considerably narrower than a competitor's privilege to interfere with prospective advantage." *Ty, Inc. v. MJC-A World of Quality, Inc.*, 1994 WL 36880, at *6 (N.D. Ill. 1994).

The relevant contracts here are the non-solicitation covenants in ALIC's EFS Agreements that EFSs signed as a condition of employment with Plaintiffs. The thrust of the argument is that Ameriprise actively induced EFSs to breach their employment agreements by stealing

confidential information and soliciting Allstate clients. *See* Pls.' Mem. in Support of Summ. J.,

at 18 (Dckt. No. 238). As Plaintiffs see it, those breaches "resulted in the disruption of hundreds

(if not thousands) of Allstate business relationships." *Id.*

Section XVIII(D) of the EFS Agreement lays out the non-solicitation provision. It reads

in full:

> For a period of one (1) year following termination, you will not solicit, sell
> or service life insurance policies, annuity contracts, or other business in
> competition with the business of the Company:
>
> 1. With respect to any person, company, or organization to whom you or
> anyone acting on your behalf sold insurance or other products or services
> on behalf of the Company and who is a customer of the Company at the
> time of termination of the Agreement;
>
> 2. With respect to any person, company, or organization who is a customer
> of the Company at the time of termination of this Agreement and whose
> identity was discovered by you as a result of your status as a Company
> agent or as a result of your access to confidential information of the
> Company; or
>
> 3. From any office or business site located within one (1) mile of your
> business location maintained pursuant to Section V of this Agreement at
> the time this Agreement is terminated.

*See* Dawson EFS Agreement, at XVIII(D) (Dckt. No. 244-2, at 85 of 254).

It is undisputed that Ameriprise knew about the EFSs' non-solicitation covenants. The

"first step" of Ameriprise's onboarding process asked a recruit "to review the registered

representative agreements you have with your current firm and send copies to your [Ameriprise]

Field Leader." *See* Transition Guide, at 10 (Dckt. No. 243-22).

EFSs complied with this instruction, and Ameriprise received agreements from several

EFSs. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 45 (Dckt. No. 278); *see also* Exhibit 25

(Dckt. No. 243-23, at 6 of 6) ("This is a non protocol move from Allstate where they have a 1

year non-solicit but inconsistent in how they enforce."); Taubman Email, at 2 (Dckt. No. 243-24)

73

("Here are the contract and the supplements.  Each of us have the same agreements.  The same is true for all the guys who have joined Ameriprise in other areas."); Exhibit 98 (Dckt. No. 243-91, at 6 of 7) ("[Ex-EFS Troy Trahan] has a 1 year non-compete and [outside counsel] told him he couldn't even replace the insurance is [sic] the clients reached out to him unsolicited and requested it.  Our willingness to let him contact clients was one of our benefits vs everyone else he talked to.").  No genuine dispute exists as to Ameriprise's knowledge.

The Court thus turns to the remaining elements of the claim:  inducement, breach, and damages.

A plaintiff bringing a tortious interference with contract claim must show that the defendant intended to cause the ultimate breach.  *Webb*, 906 F.3d at 579; *see also* Restatement (Second) of Torts § 766 cmt. h (Am. Law. Inst. 1979) ("The essential thing is the intent to cause the result.  If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.").

Inducement is a high bar.  It "'requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another.'"  *Zeigler Auto Grp. II, Inc. v. Chavez*, 2020 WL 231087, at *9 (N.D. Ill. 2020) (quoting *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011)); *R.E. Davis Chem. Corp. v. Diatonic, Inc.*, 826 F.2d 678, 687 (7th Cir. 1987), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991).  A plaintiff cannot state a claim by "[m]erely pointing to passive conduct that the defendant knows is likely to benefit him."  *Zeigler Auto Grp. II*, 2020 WL 231087, at *9.  "Instead, inducement must be shown through some active persuasion or encouragement."  *Id.*

74

At the same time – and unlike a claim for tortious interference with prospective economic advantage – a tortious interference with contract claim doesn't require ill will. "In the context of claims for tortious interference with contract, malice does not require a showing of ill will, hostility or intent to injure; rather, it requires a showing that the defendant acted intentionally and without just cause." *Webb*, 906 F.3d at 579 (7th Cir. 2018) (quoting *Strosberg v. Brauvin Realty Servs., Inc.*, 691 N.E.2d 834, 845 (Ill. App. Ct. 1998)).

Plaintiffs describe in detail the course of conduct Ameriprise engaged in to intentionally and unjustifiably induce the breach. As Plaintiffs see it, Ameriprise was "the Field General who directed the EFSs' to steal Allstate confidential information, turn over the stolen information to Ameriprise, and violate their EFS Agreements by using the stolen confidential information and soliciting customers on behalf of Ameriprise." *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 292).

Plaintiffs break Ameriprise's conduct into two categories: (1) Ameriprise's financial incentives and compensation plans; and (2) its transition and onboarding process. Both create genuine issues of material fact on inducement.

The Court starts with Ameriprise's financial incentives and compensation plans. As Plaintiffs see it, "Ameriprise's expectation that the EFSs transition their Allstate books of business is clear from the compensation plans Ameriprise puts in place." *See* Pls.' Mem. in Support of Summ. J., at 19 (Dckt. No. 238).

The Court agrees. Ameriprise offered its new hires financial rewards to hit high assets under management targets – in excess of tens of millions of dollars – within their first 180 days, while the non-solicitation covenant was still in effect. *See* Pls.' Statement of Facts, at ¶ 58 (Dckt. No. 239); Def.'s Resp. to Pls.' Statement of Facts, at ¶ 58 (Dckt. No. 278). Yet,

Ameriprise did not provide incoming financial advisors with books of business to service, its Rule 30(b)(6) witness testified.

Plaintiffs argue that the only way a new Ameriprise financial advisor could reach its lofty goals was to transition a significant number of policies from Allstate to Ameriprise. In other words, according to Plaintiffs, Ameriprise offered financial incentives for advisors to solicit their former Allstate clients right away, in breach of their contracts.

Plaintiffs' lay out a reasonable story. A jury could find evidence of inducement in Ameriprise's compensation plan. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 879 (N.D. Ill. 2001) (granting summary judgment where a competitor agreed "agreed to compensate [the former employee] for directly competing against [plaintiff], including calling upon the very same customers that he had just called upon for [plaintiff]").

The Court next considers Ameriprise's transition and onboarding process.

Plaintiffs allege that Ameriprise's "portability analysis" is designed to ensure that departing EFSs could bring over most of their books of business to Ameriprise. *See* Pls.' Mem. in Support of Summ. J., at 18 (Dckt. No. 238). In one email from an Ameriprise recruitment manager, the manager explains that Ameriprise uses the details of an EFS's book of business "to understand any product capabilities that may need to be addressed prior to appointment" and to "expedite the transfer of your client's assets to Ameriprise." *See* Pls.' Statement of Facts, at ¶ 58 (Dckt. No. 239).

Regardless, this does not amount to inducement. Making sure that a recruit's products align with Ameriprise's offerings simply "create[s] a condition that open[s] the way" for the EFSs to breach their contracts. *See Pampered Chef*, 804 F. Supp. 2d at 802. That's not enough.

Plaintiffs must do more than show that Ameriprise made client transfers easier. They must show "some active persuasion, encouragement, or inciting" of the EFSs to breach their non-solicitation covenants. *Id.*

Plaintiffs next argue that "Ameriprise's procedures for the EFSs' transition demonstrate an orchestrated effort to have the EFSs breach their obligations under the EFS Agreement and solicit clients." *See* Pls.' Mem. in Support of Summ. J., at 20 (Dckt. No. 238). Here, Plaintiffs raise a genuine, triable issue of material fact.

From minute one, Ameriprise engaged in a well-coordinated effort to have new financial advisors reach out to clients. Ameriprise had an undisputed practice of encouraging incoming financial advisors to create "holiday lists" of clients before they departed their old firm. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 88 (Dckt. No. 278). Ameriprise then used that list to generate announcement cards, which it sent to the listed clients after the advisor's transition to Ameriprise. *Id.*

And after that transition, Ameriprise instructed advisors to "begin notifying people and tell them about your move to Ameriprise." *See* Exhibit 36, at 19 (Dckt. No. 243-29); *see also* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 100 (Dckt. No. 278). Ameriprise also stressed the importance of phone calls: "Do not use your one phone call to leave a voicemail – instead try them again so you can speak to them live." *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 86 (Dckt. No. 278).

But Ameriprise didn't stop there. The transition plan instructed new advisors to "clearly articulate [to holiday list clients] why you made the move and how it will benefit them." *See* Transition Guide, at 18 (Dckt. No. 243-22).

The plan made clear that an advisor should only use such language "[i]f a contact asks for more information about Ameriprise." *Id.* Still, there is evidence that Ameriprise encouraged advisors to build in pauses to their phone calls, so that clients *would* ask questions.

For example, one email from an Ameriprise franchisee financial advisor to a departing EFS included the following advice:

> Since this is a non-protocol move, we can't solicit clients to move here, but we can answer their questions if they ask how to move with you. Here is a rough script I put together based on our chats with Dani:
>
> . . .
>
> "Good afternoon Mr. Client, bob Olvera calling. Just calling to tell you some exciting news, for a multitude of reasons I have left allstate and joined Ameriprise Financial"
>
> . . . pause . . . . pause . . .
>
> Why did you leave?
>
> "Great question. I left because (1) Ameriprise is the best in the industry in financial planning; more specifically, savings strategies, retirement income planning, and tax diversification; (2) Access to more investments and tools to help me better serve my clients; (3) Joining a team that allows me to grow as an advisor and leverage our collective experience."
>
> . . . pause . . . . pause . . .
>
> Sounds good, how do we follow you there?

*See* Exhibit 76, at 2 (Dckt. No. 243-65). Another email suggested the following script:

> "I made the decision to leave Allstate and I joined Larson Reynolds & associated with Ameriprise. I wanted you have my new contact information. *Pause*. Give address and phone.
>
> If client asks any questions when you pause, you can answer them.

*See* Exhibit 77, at 2 (Dckt. No. 243-66) (emphasis added).

Of course, Ameriprise's announcement strategy only amounts to inducement if the conduct it encouraged amounts to solicitation, *i.e.*, breach of the EFS Agreement. And "there is a significant distinction between mere contact and solicitation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cross*, 1998 WL 122780, at *2 (N.D. Ill. 1998).

"Under Illinois law . . . whether a particular client contact constitutes a solicitation depends upon the method employed and the intent of the solicitor to target a specific client in need of his services." *Henry v. O'Keefe*, 2002 WL 31324049, at *5 (N.D. Ill. 2002) (cleaned up) (quoting *Tomei v. Tomei*, 602 N.E.2d 23, 26 (Ill. App. Ct. 1992)). "The law does not require an express request for business in order for a solicitation to occur," but instead looks to the intent of the party and "how a particular contact was reasonably understood by the participant." *Id.* "[T]he law generally deems a person to have intended the natural consequences of [his] actions." *Id.* Winks and nods – and pauses – can amount to solicitation.

Here, a reasonable jury could find that advisors' pauses amounted solicitation, and that Ameriprise's role amounted to active inducement. Ameriprise affirmatively instructed new advisors to engage in a kind of "announcement-plus." That is, not only did Ameriprise send out physical announcement cards, but it also told advisors to call clients individually. Then, it coached advisors on how use that call to get clients asking about Ameriprise.

Ameriprise's conduct after a new financial advisor started with the company lends credence to this conclusion. Ameriprise provided some new advisors – those with large books of business – with "transition teams" designed to assist the new advisors with "transfer processes." *See* Transition Guide, at 5 (Dckt. No. 243-22, at 6 of 63). An Ameriprise transition team would then maintain a customer "Tracking Log" to show the progression of the transfer of business from Allstate to Ameriprise. *See* Def.'s Resp. to Pls.' Statement of Facts, at ¶ 85 (Dckt.

No. 278). All this evidence suggests that Ameriprise expected – indeed, intended – for EFSs to transition their clients.

Other courts in this district have found similar conduct by individual employees to amount to solicitation. *See, e.g.*, *E\*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at \*3 (N.D. Ill. 2018) ("If Pospisil's intent was simply to inform her clients of her move to another brokerage, one would expect a mass mailing or an email containing a simple announcement."); *YCA, LLC v. Berry*, 2004 WL 1093385, at \*10–11 (N.D. Ill. 2004) (finding that the defendant's personal contact with a former client, combined with evidence that defendant's new employer had prepared a list of high client probabilities, created material disputes of fact); *Merrill Lynch*, 1998 WL 122780, at \*2 (finding evidence of solicitation where the defendant "personally contacted Merrill Lynch customers," and "did not simply contact previous customers to provide them with information as to his whereabouts" but instead provided account-transfer forms); *Gateway Sys., Inc. v. Chesapeake Sys. Sols., Inc.*, 836 F. Supp. 2d 625, 636–37 (N.D. Ill. 2011) (finding a genuine dispute of fact as to solicitation where counter-plaintiff contacted counter-defendant's customers "in an effort to enter into direct licensing relationships").

But at the end of the day, Plaintiffs ask this Court to infer that Ameriprise's inducement was intentional and unjustified. *See* Pls.' Reply to Def.'s Mtn. for Summ. J., at 26 (Dckt. No. 292) ("Ameriprise's motive is apparent – easily inferred – from the structure and incentive of the compensation plans."). Such an inference is for the jury to make.

Viewed in the light most favorable to Ameriprise, evidence shows that it affirmatively instructed recruits not to solicit former clients during announcement calls. A jury could also reasonably find that Ameriprise's compensation incentives assumed the EFSs would act in good

faith and not solicit former clients in violation of their EFS Agreements. Simply put, a jury could find that Ameriprise was playing by the rules.

So, the Court cannot conclude that the announcement strategy was a "thinly veiled ploy" to have EFSs breach their covenants and solicit Allstate clients, or that "Ameriprise was well aware that the EFSs never intended to, and did not comply with, the terms of their EFS Agreements." *See* Pls.' Mem. in Support of Summ. J., at 24, 27 (Dckt. No. 238). These questions of intent are for the jury.

As to the fifth and final element, damages, the Court concludes that genuine dispute of material fact exists as to whether Ameriprise's conduct damaged Plaintiffs. *See Marlite, Inc. v. Eckenrod*, 2011 WL 39130, at *9–10 (S.D. Fla. 2011) (denying defendant's summary judgment motion where evidence showed that defendant made no effort to stop his employee's contact with customers despite knowing that the former employee was subject to a non-solicitation agreement).

Plaintiffs' motion for summary judgment on the tortious interference with contract claim is denied, and Defendant's motion is denied.

### 1. California Law

Ameriprise asks this Court to grant summary judgment on the tortious interference with contract claims relating to California-based EFSs. Ameriprise argues that the non-solicitation clause in the EFS Agreement is unenforceable under California law. *See* Def.'s Mem. in Support of Summ. J., at 29 (Dckt. No. 242). So, there were no valid contracts to interfere with as to those EFSs.

California Business and Professional Code § 16600 provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession,

trade, or business of any kind is to that extent void." *See* Cal. Bus. & Prof. Code § 16600. Courts have confirmed the breadth of the provision in no uncertain terms: the California Supreme Court "generally condemns noncompetition agreements." *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th 937, 946 (Cal. 2008). Same goes for non-solicitation agreements. *See Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 826–27 (N.D. Ill. 2019). Subject to several exceptions, "covenants not to compete are void" in California. *Edwards*, 44 Cal. 4th at 945.

California courts have found non-solicitation agreements enforceable under certain circumstances. Courts "have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information* to solicit those customers." *The Retirement Grp. v. Galante*, 176 Cal. App. 4th 1226, 1238 (2009) (emphasis in original). Thus, "section 16600 invalidates provisions in employment contracts and retirement pension plans that prohibit an employee from working for a competitor after completion of his employment or imposing a penalty if he does so unless they are necessary to protect the employer's trade secrets." *Edwards*, 44 Cal. 4th at 946 (cleaned up); *see also Richmond Techs., Inc. v. Aumtech Bus. Sols.*, 2011 WL 2607158, at *18 (N.D. Cal. 2011) ("[A] non-compete or non-solicitation clause may be valid under Section 16600 if it is necessary to protect a trade secret.").

But the exception doesn't apply here because the Court finds that the non-solicitation provision in the EFS agreement is unenforceable under California law. The provision sweeps far more broadly than necessary to protect Allstate trade secrets. *See Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564, 577 (Cal. App. Ct. 2009) (finding clauses void because they were

"not narrowly tailored or carefully limited to the protection of trade secrets, but are so broadly worded as to restrain competition").

The non-solicitation provision entirely prohibits EFSs from "solicit[ing], sell[ing] or servic[ing] life insurance policies, annuity contracts, or other business" with respect to any ALIC customer at the time of termination of the Agreement. *See* Dawson EFS Agreement, at XVIII(D) (Dckt. No. 244-2, at 85 of 254). The provision applies whether the contact stemmed from the misuse of trade secrets. "California law simply does not countenance such broad restraints on competition." *See Richmond Techs.*, 2011 WL 2607158, at *18 (finding a non-solicitation provision void as a matter of law where it prohibited employees from conducting any business with plaintiff's customers, "regardless of whether [defendant] initiated the contact or whether the contact resulted in the misuse of trade secrets"); *see also Gen. Elec. Co.*, 394 F. Supp. 3d at 826–27 (finding void, under California law, a non-solicitation agreement in which employees agreed not to solicit or encourage senior employees to leave the company).

The Court therefore grants summary judgment on the tortious interference with contract claims relating to the three California-based EFSs – Robert Dawson, Brent Rupnow, and Catherine Heath.

## IV.    Unfair Competition (Count III)

Last, Plaintiffs allege that Ameriprise committed the tort of unfair competition, leading to unfair advantages in the marketplace. *See* Cplt., at ¶¶ 140–47 (Dckt. No. 1).

"Under Illinois law, the principal form of the tort of unfair competition falls under the rubric of tortious interference with prospective economic advantage. In connection with a claim of unfair competition, Illinois courts require a plaintiff to plead and prove every element of a claim for tortious interference with prospective economic advantage." *Holbrook Mfg. LLC v.*

*Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 341 (N.D. Ill. 2020) (cleaned up); *see also Advanced Physicians, S.C. v. ATI Holdings, LLC*, 2015 WL 4730738, at ¶ 36 (Ill. App. Ct. 2015) ("Illinois courts have held that allegations that are insufficient to state a cause of action under a specific statute or business tort are likewise insufficient to support a broader common law claim of unfair competition."); *The Film & Tape Works*, 856 N.E.2d at 622 ("Since, for the reasons discussed, we have concluded that there is no evidence to support FTW's allegations of interference, we can dispose of the unfair competition claim as well without necessitating any further analysis."); *Zenith Elec. Corp. v. Exzec, Inc.*, 1997 WL 223067, at *6 (N.D. Ill. 1997) (collecting cases).[10]

Here, both parties' motions for summary judgment on unfair competition rely on the same conduct as the tortious interference claim. The facts are the same, and the outcome is the same. Plaintiffs' motion for summary judgment on the unfair competition claim is denied, and Defendant's motion is denied.

### Conclusion

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is denied. Defendant's motion for summary judgment is granted in small part and denied in large part.

---

[10] Plaintiffs cite *Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110 (7th Cir. 1990) for the proposition that the Seventh Circuit has identified a two-prong test for unfair competition. *See* Pls.' Mem. in Support of Partial Summ. J., at 28 (Dckt. No. 238). That test requires: "(1) that the defendant obtained access to the idea through an abuse of a fiduciary or confidential relationship with the plaintiff or via some sort of fraud or deception;" and (2) "that the defendant's use of the idea deprived the plaintiff of the opportunity to reap its due profits on the idea." *Wilson*, 915 F.2d at 1119 (citation omitted). Plaintiffs' reliance on *Wilson* is misguided. There, the Seventh Circuit was applying New York state law, and reciting the elements applied by New York courts for unfair competition claims. *Id.* Illinois law applies here. And in Illinois, "[t]he principal form of the tort as it applies to circumstances arising from alleged interference with third party relations apparently falls under the rubric of tortious interference with prospective economic advantage." *Integrated Genomics, Inc. v. Kyrpides*, 2010 WL 375672, at *14 (N.D. Ill. 2010) (cleaned up).

Date:   August 18, 2023

Steven C. Seeger
United States District Judge